## KUWAITI DANISH COMPUTER CO. *vs.* DIGITAL EQUIPMENT CORPORATION.

Middlesex. November 4, 2002. - January 16, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Contract,* Performance and breach, Offer and acceptance, Misrepresentation. *Frauds, Statute of. Practice, Civil,* Summary judgment, Instructions to jury, New trial, Judgment notwithstanding verdict. *Sale,* Contract of sale. *Waiver. Fraud. Consumer Protection Act,* Businessman's claim, Unfair or deceptive act. *Words,* "Primarily and substantially."

A Superior Court judge correctly allowed a motion for summary judgment in favor of the defendant, a seller of computer equipment, on a contract claim by the prospective buyer of the equipment, where a price quotation by a salesperson employed by the seller, which stated that it was an invitation only and required further approval by someone in authority, and the purchase order from the plaintiff buyer did not evidence an existing contract of sale within the meaning of G. L. c. 106, § 2-201 (1) [464-465]; further, this court declined to address an alternate theory by the buyer that a writing satisfying the requirements of § 2-201 (1) was not required because of the existence of circumstances recognized under G. L. c. 106, § 2-201 (2), as an exception to § 2-201 (1), where the jury, after answering special questions indicating they had accepted the buyer's evidence and its theory, determined that the seller had not failed to perform, and where the buyer's contentions that the jury's verdict was erroneous and against the weight of evidence were without merit. [465-467]

In an action by the buyer of computer equipment on its claim for misrepresentation against the seller of the equipment, the judge erred in denying the seller's motion for judgment notwithstanding the verdict, where the motion should have been allowed either on the ground that the evidence was insufficient as a matter of law to support a finding that the buyer reasonably relied on a misrepresentation attributable to the seller [467-469], or on the ground that the buyer had not shown that it reasonably relied to its detriment [469-470].

In an action by the buyer of computer equipment against the seller of the equipment on a claim alleging a violation of G. L. c. 93A, § 11, the seller was entitled to judgment, where it met its burden of proving that the actions and transactions constituting unfair acts or practices under the § 11 claim occurred primarily and substantially outside the Commonwealth. [470-475]

CIVIL ACTION commenced in the Superior Court Department on January 13, 1993.

A motion for summary judgment was heard by *Howard J. Whitehead*, J., and the case was tried before *Allan van Gestel*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert W. Crowley* for the plaintiff.

*Laurie F. Rubin* for the defendant.

*Michael E. Malamut*, for New England Legal Foundation, amicus curiae, submitted a brief.

SPINA, J. Kuwaiti Danish Computer Co. (KDCC) sued Digital Equipment Corporation (DEC), alleging breach of contract, misrepresentation, and violation of G. L. c. 93A. The contract claim was eliminated on DEC's motion for summary judgment on the ground that the writings failed to comply with the Statute of Frauds, but the trial judge, who was not the motion judge, allowed KDCC to present its contract claim at trial under G. L. c. 106, § 2-201 (2), an exception to the Statute of Frauds. The common-law counts were tried to a jury in the Superior Court, and the judge reserved all aspects of the c. 93A claim to himself. The jury found for DEC on the count alleging breach of contract, but awarded KDCC damages in the amount of $65,500.80 on the count alleging misrepresentation. The judge found for KDCC on the c. 93A count, and awarded damages of $90,920.30, which he doubled after determining that DEC's violation of G. L. c. 93A, § 2, had been wilful and knowing.[1] DEC appealed, asserting that the judge committed error (1) by permitting KDCC's counsel to read to the jury DEC's alternative affirmative defense to the contract claim; (2) by excluding the deposition testimony of a DEC sales manager, who was unavailable to testify on the subject of the alternative affirmative defense; (3) in his instructions on reasonable reliance; (4) by denying its motion for judgment notwithstanding the verdict (judgment n.o.v.) on the misrepresentation claim; and (5) by finding a violation of G. L. c. 93A, including a finding that the unfair conduct complained of occurred primarily and substantially within the commonwealth. KDCC cross-appealed, claiming error in the allowance of DEC's motion for summary

---

[1] General Laws c. 93A, § 11, provides for an award of multiple damages if the violation of § 2 is wilful or knowing.

judgment as to the contract claim, and in the denial of prejudgment interest on the multiple damages awarded under c. 93A. We transferred the case from the Appeals Court on our own motion. We affirm the judgment on the contract count, and reverse the judgment on the count alleging misrepresentation because DEC's motion for judgment notwithstanding the verdict should have been allowed. We also reverse the c. 93A judgment because the conduct in question "did not occur primarily and substantially within the commonwealth." G. L. c. 93A, § 11, eighth par.

1. The jury could have found the following facts. KDCC is a Kuwaiti corporation engaged in the business of buying and selling computer equipment and systems, principally in the Middle East. It had business dealings with DEC, a Massachusetts business corporation, in Massachusetts during the mid-1980's, but in 1989 DEC insisted that any future business involving products destined for resale in Kuwait be conducted either through DEC's United Kingdom facility or independent distributors responsible for delivery of products to Kuwait.

In September, 1991, Kuwait University, in Kuwait, awarded a fixed-price turnkey contract to KDCC to supply, install, and maintain computer systems for its college of engineering. The contract called for installation of various computer systems by mid-January, 1992. Duplicate VAX 6510 systems made by DEC were to be the centerpiece of the project, and smaller systems made by other manufacturers would also be needed. Because of the fixed-price structure of its contract, KDCC sought to minimize its expenses by obtaining an educational discount on its purchase.

Farouk Ayoub, a representative of Kuwaiti Digital Computer Co., a Massachusetts business corporation and wholly owned subsidiary of KDCC, contacted DEC's Waltham office on behalf of KDCC and sent a list of requirements for the VAX 6510 systems for the college of engineering at Kuwait University. Ayoub also advised that KDCC was looking for the educational discount. He was referred to DEC's Washington, D.C., office, having been informed that educational discounts were handled by that office. DEC's Waltham office forwarded the list of requirements to Norris Roy, the designated salesperson in its Washington office.

Roy telephoned Ayoub a few days later and quoted a price of approximately $900,000. Ayoub told him it was out of the question and that KDCC needed the educational discount because the system was for a university. Roy said he would get back to him. The two talked several times over the following several days, and Ayoub told Roy that his budget was in the neighborhood of $600,000. As the negotiations progressed Roy expressed an interest in closing the deal before the end of September. Ayoub arranged a teleconference among himself; his superior at KDCC, Sayed Ismail; Roy; and Roy's supervisor, Luletha Cheatham. They discussed price, the need to network the various components made by other manufacturers, and the delivery deadline in Kuwait.

Ayoub, Ismail, and Roy met in Washington for three days, starting October 1, 1991, to finalize the deal. Ismail had authority to negotiate all matters on behalf of KDCC, and because Ismail had a tight time schedule, Cheatham told Ismail that Roy had authority for DEC. Cheatham was not able to attend the meeting because of a prior commitment. Ismail and Ayoub produced evidence at the meeting, as requested, that they were acting for an educational institution. That evidence consisted of a letter from the dean of Kuwait University, Kuwait, indicating that KDCC was awarded the contract for delivery of systems to the university. At that meeting, Roy understood, if he had not understood before, that the computer systems were to be shipped to Kuwait.

By October 3, 1991, Roy and Ismail reached an agreement about the parts and pricing issues. Roy prepared a quotation that included a price of $601,799.20, with the educational discount, and the list of specific parts and components agreed on. The quotation also contained qualifying statements that it was "an invitation to offer only," and that "[a]ny contract resulting from the quotation must be accepted at [DEC's] Corporate offices by a duly authorized representative of [DEC]." Although Ismail and Ayoub reviewed the quotation for parts and pricing, they did not take the time to read these statements, which were contained in two paragraphs appearing below the total price quote and above Roy's signature. Roy did not discuss the qualifying language with Ismail, and he did not tell Ismail that any further approval was required from anyone at DEC. At Roy's request, Ismail prepared

a purchase order. The purchase order, signed by Ismail, expressly referred to the quotation prepared by Roy. Roy also gave Ismail details for a letter of credit that would be needed for payment. The three men expressed satisfaction with the deal, shook hands, and parted.

On Monday, October 7, 1991, Roy delivered the paperwork to Robert Burklow, DEC's district operations manager, for approval. Burklow expressed doubts about the transaction because it would violate established DEC policies: (1) the educational discount was not available to educational institutions outside the United States, and (2) he was not authorized to approve transactions involving shipment of goods outside his district. At Roy's request, Burklow agreed to make inquiry at higher corporate levels to see whether an exception to company policy could be made. Burklow was told that an exception would not be made.

Roy, who thought the deal was "dead" as of October 8 or 9, never alerted Ayoub to any problems during their ongoing telephone conversations until sometime during the week of October 14. When Roy broke the news to Ayoub, he only told Ayoub that there were some problems but that they would work it out. Roy and Cheatham telephoned Ayoub a few days later and told him that DEC wanted an additional $150,000. They did not tell him the real reasons for the rejection. Ayoub was angry and asked to speak with someone higher up the corporate ladder. They referred him to Edward Scully, the Washington district sales manager.

Ayoub left a message for Scully, who called him back three or four days later. Scully told Ayoub that KDCC would have to pay an additional $150,000.[2] Ayoub demanded that Scully refer him to the "highest level" at DEC. Scully referred him to Robert Nealon, head of the operations department, whose office was in Boxborough, Massachusetts. Ayoub explained the situation to Nealon, who asked Ayoub to send him copies of the documents he had, and said that he would look into the matter. Nealon

---

[2]In his findings on the c. 93A count, the judge credited Scully's version, in which Scully told Ayoub that the sale could not go through the Washington, D.C., office, but had to be handled by the overseas sales office, and that government procedures also had to be met before foreign sales could be approved.

telephoned Ayoub about ten days later and explained that DEC would not go ahead with the deal.[3]

KDCC then moved quickly to obtain the same DEC systems through an alternative supplier. On October 25, 1991, KDCC contracted with Cambridge Trading Services Corporation (CTSC) to deliver the same systems for $667,300 by the end of November, 1991, before the mid-January, 1992, installation deadline in its contract with Kuwait University. CTSC arranged to purchase the systems through an undisclosed DEC distributor. Due to various mishaps, the turnkey project was not accepted by Kuwait University until May 11, 1992.

2. *Contract claim.*

(a) *Statute of Frauds.* KDCC argues that the motion judge erred by allowing DEC's motion for summary judgment on its contract claim. The judge had ruled that the writings were insufficient "to indicate that a contract for sale has been made." G. L. c. 106, § 2-201 (1).[4] Applying the standard of review for a grant of summary judgment, we take the evidence in the light most favorable to the nonmoving party to determine whether all material facts had been established and whether DEC was entitled to judgment as a matter of law. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991).

The writings in question were Roy's quotation and Ismail's purchase order, both prepared on October 3, 1991. Roy's quotation was qualified by statements that it was an "invitation to offer only," and that "[a]ny contract resulting from the quotation must be accepted at [DEC's] Corporate offices by a duly authorized representative of [DEC]." The qualifying language appears between the total price quote and Roy's signature, and there was no evidence that it was concealed from Ayoub or

---

[3]The judge's c. 93A findings credited Nealon's testimony on this point, in which Nealon told Ayoub that DEC's policy only permitted educational discounts for schools in the United States, and DEC policy did not permit sales to be made out of the district. Nealon recommended that Ayoub attempt to purchase the systems through DEC's foreign sales office.

[4]The parties have at all relevant times assumed that the applicable law is the law of Massachusetts. We accept that assumption for purposes of this appeal. The parallel provisions of the Uniform Commercial Code contained in D.C. Code § 28:2-201(1) and (2) (2001) are identical to G. L. c. 106, § 2-201 (1) and 2-201 (2).

Ismail. Ayoub and Ismail reviewed the quotation and had the opportunity to read the qualifying language, but instead ignored it.

Roy's quotation and Ismail's purchase order do not evidence an existing contract within the meaning of G. L. c. 106, § 2-201 (1). Rather, the qualifying language of the quotation looks toward some future contract. See *Conaway* v. *20th Century Corp.*, 491 Pa. 189, 201 (1980); *R.S. Bennett & Co.* v. *Economy Mechanical Indus., Inc.*, 606 F.2d 182, 185-186 (7th Cir. 1979). This court has said that a price quotation generally is not an offer, but "a request or suggestion that an offer be made." *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. 363, 366 (1972). That is especially true here, where the quotation states that it is an invitation only, and that further approval by someone in authority is required before a contract can be formed.

We would reach the same result under G. L. c. 259, § 1, the Massachusetts general Statute of Frauds. In *Fichera* v. *Lawrence*, 312 Mass. 287, 288 (1942), this court held that a memorandum of an auction sale that contained a condition that conveyance of property was "dependent upon acceptance of the deposit and confirmation of the sale by the city or its duly authorized representative" was not an enforceable contract within the meaning of the statute.

Ismail's claim that he had no knowledge of the qualifying language in Roy's quotation because he never read it and because Roy never brought it to his attention is to no avail. Roy's quotation was incorporated by reference in Ismail's signed purchase order. Because Ismail intended that they serve as a legal document, he is presumed to know their contents. See *Hull* v. *Attleboro Sav. Bank*, 33 Mass. App. Ct. 18, 24 (1992), and cases cited.

Summary judgment was properly granted.

(b) *Writing in confirmation.* The trial judge granted KDCC partial relief from the order for summary judgment on its contract claim, as he permitted KDCC to proceed on an alternate theory. "Although a judge should not lightly undo the work of another judge, *Barbosa* v. *Hopper Feeds, Inc.*, 404 Mass. 610, 622 (1989), the power to reconsider an issue remains in the

court until final judgment." *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991).

At trial, KDCC proceeded on the theory that a writing satisfying the requirements of G. L. c. 106, § 2-201 (1), was not required because of the existence of circumstances recognized under G. L. c. 106, § 2-201 (2),[5] as an exception to § 2-201 (1). Under KDCC's theory, Ismail's purchase order of October 3, 1991, was "a writing in confirmation" of an oral contract made between merchants, and DEC's failure to give KDCC a written notice of objection within ten days of receipt thereof satisfied the requirement of a writing under § 2-201 (1). See G. L. c. 106, § 2-201 (2). We need not address the validity of this argument because the jury found in favor of DEC. The jury answered special questions indicating that they had accepted KDCC's evidence and its theory, but the jury determined that DEC had not failed to perform.

KDCC argues that the verdict was erroneous, for two reasons. First, although it concedes that the jury were properly instructed on the contract claim, KDCC contends that the jury were confused and their verdict was inconsistent with the uncontroverted evidence. Faced with such a result, a party must request the judge to instruct the jury to reconsider their verdict before they are discharged and when there is time to correct any inconsistency. Failure to make such a timely request constitutes a waiver of any challenge to the verdict on the ground that it is inconsistent. See *Service Publ., Inc.* v. *Goverman*, 396 Mass. 567, 573 (1986). The issue is waived.

Second, KDCC contends that the verdict was against the weight of the evidence. See *Scannell* v. *Boston Elev. Ry.*, 208 Mass. 513, 514 (1911). The issue is not properly before us. Whether the verdict was against the weight of the evidence is not a question for an appellate court to decide in the first instance. It is a question committed to the discretion of the trial judge in a motion for a new trial. If an appeal is taken from the

---

[5]General Laws c. 106, § 2-201 (2), states: "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."

judge's action on such a motion, we will review that decision for an abuse of discretion. See *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60 (1948).[6]

3. *Misrepresentation claim.* DEC claims error in the denial of its motion under Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), for judgment n.o.v. on KDCC's misrepresentation claim. DEC had alleged in its motion that the evidence was insufficient as a matter of law to support a finding that KDCC's reliance was both reasonable and detrimental. See *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360, 365 (1993). When reviewing the denial of a motion for judgment n.o.v. we must ask "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

(a) *Reasonable reliance.* The primary points on which KDCC relied were the statements and actions of Roy on October 3, 1991, when, at the end of negotiations, Roy, Ayoub, and Ismail shook hands and expressed satisfaction with the deal they had struck. The obstacle to a finding of reasonable reliance is the qualifying language in the quotation prepared by Roy.

It is true, as KDCC contends, that in *Yorke* v. *Taylor*, 332 Mass. 368, 374 (1955), this court adopted the rule of the Restatement of Torts § 540 (1938), which states: "The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation." The court also noted, however, that "[t]he plaintiff here was not relying on a statement of opinion nor on a representation that was either preposterous or palpably false.

---

[6]Because of our ruling, we need not address DEC's argument that it was error for the judge to permit KDCC's counsel to read in evidence as an admission to the existence of a contract DEC's sixth affirmative defense, namely, "Any contract formed as alleged by KDCC was due to mistake." We note, however, that there is merit to DEC's argument. DEC pleaded mistake and the Statute of Frauds as alternative affirmative defenses in its answer to the complaint. "[A]lternative or inconsistent pleadings may not be used as binding judicial admissions." *Linthicum* v. *Archambault*, 379 Mass. 381, 386 (1979), and cases cited.

See Restatement of Torts § 541." *Id.* Restatement (Second) of Torts §§ 540 and 541 (1977) are similar to their 1938 Restatement counterparts. Restatement (Second) of Torts § 540 states: "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 541 states: "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." There is thus a distinction between a falsity that could only be uncovered by way of "investigation" and a falsity that was readily apparent or "obvious." Comment a to Restatement (Second) of Torts § 540, *supra,* states that, "if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541."

Reliance on any statement or conduct of Roy made during the course of mutual congratulations at having reached a deal was unreasonable as a matter of law because it conflicted with the qualifying language of Roy's quotation, which stated that it was only an invitation to offer, and that any contract required approval from someone with authority at DEC. A cursory review of this language in the quotation would have alerted Ayoub and Ismail that they could not rely on (or interpret) Roy's statements as indicative of a final deal. The qualifying language was presented essentially contemporaneously with Roy's statements. No "investigation" was required. All that was required of Ayoub and Ismail was that they read the document to ascertain the obvious. See *Mahaney* v. *John Hancock Mut. Life Ins. Co.,* 6 Mass. App. Ct. 919, 920 (1978); *Coll* v. *PB Diagnostics Sys., Inc.,* 50 F.3d 1115, 1124-1125 & n.6 (1st Cir. 1995); *Trifiro* v. *New York Life Ins. Co.,* 845 F.2d 30, 33 (1st Cir. 1988). There was no evidence that Roy tried to conceal the qualifying language from Ayoub or Ismail, or that he lulled them into ignoring it. See *Snyder* v. *Sperry & Hutchinson Co.,* 368 Mass. 433, 446 (1975). There was no evidence that Roy represented that the deal would be approved by those with that authority. Cf. *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722, 726 (1974).

There is no merit to KDCC's assertion that it also relied on

the representations of Cheatham as to Roy's authority, because those representations, like Roy's assertion of a deal, were contradicted by the qualifying language in Roy's quotation. Even if KDCC reasonably could have relied on the late-September, 1991, representations by Cheatham that Roy had authority to contract,[7] KDCC could not show that such reliance was reasonable after October 3, 1991, when it received Roy's quotation. It should have been obvious to anyone who took the time to read the entire quotation that Roy did not have authority to make a contract. The brightest star in KDCC's constellation of points on which it relied, Roy's expression of satisfaction at having reached a deal, was flickering "no deal" by virtue of the qualifying language in the quotation.[8]

KDCC's theory as to other alleged misrepresentations is unavailing. Scully's statement suggesting that KDCC pay an additional $150,000 was a statement of rejection, not that a deal had been struck. Contrary to KDCC's urging, any statements by Burklow, Scully, and Nealon to make further inquiry reasonably could not be relied on as representations that a contract would be executed. Such statements may properly support hope, but they do not support reasonable reliance. At best, they were no more than a promise to investigate.

(b) *Detrimental reliance.* KDCC's evidence of misrepresentation was also deficient on another necessary element. KDCC offered no evidence that any losses it incurred were caused by its reliance on a misrepresentation attributable to DEC. See *Hurwitz* v. *Bocian*, 41 Mass. App. Ct. 365, 370-371 (1996). In particular, KDCC offered no evidence that, but for the alleged misrepresentation, it could have obtained computer equipment at a lower price than it subsequently paid. Nor was there evidence of delay damages, as KDCC found a substitute provider who agreed to install the computer at Kuwait University within the time provided under its turnkey contract. Evidence of other expenses incurred by KDCC were not shown

---

[7]The deposition testimony of Cheatham, which the judge would not permit DEC to read, indicates that Cheatham denied making such representations.

[8]KDCC's further assertion that it relied on DEC's original home office referral to its Washington office similarly fails. Nothing in the mere fact of that referral would reasonably be interpreted as countermanding the qualifying language or expanding the scope of Roy's authority.

to have been caused by any misrepresentation attributable to DEC.[9]

DEC's motion for judgment n.o.v. should have been allowed either on the ground that the evidence was insufficient as a matter of law to support a finding that KDCC reasonably relied on a misrepresentation attributable to DEC, or on the ground that KDCC had not shown that it reasonably relied to its detriment.[10]

4. *Chapter 93A.* DEC challenges the judge's determination that its alleged unfair conduct occurred "primarily and substantially" in Massachusetts. The burden of proof on this issue rests with DEC. See G. L. c. 93A, § 11, eighth par.[11] We accept the judge's findings of fact on this issue absent clear error, but whether DEC met its burden is a question of law subject to plenary review. See *Sonesta Int'l Hotels Corp.* v. *Central Fla. Invs., Inc.*, 47 Mass. App. Ct. 154, 158 (1999).

The judge determined that the unfair and deceptive practices occurred primarily and substantially in Massachusetts. We summarize his findings on the issue. DEC was at all material times a Massachusetts corporation; DEC and Kuwaiti Digital (KDCC's subsidiary) had done a substantial amount of business between 1984 and 1988; DEC moved its servicing of KDCC's inquiry to its Washington office, ostensibly because it believed that the inquiry was for a university in the Washington area; until October 2, 1991, what had occurred between the parties

---

[9]There is no merit to KDCC's claim that the jury properly awarded contract (benefit of the bargain) damages. In an action for misrepresentation, this measure of damages is available where, unlike here, a party has been induced by fraud to enter into a business transaction and thereafter discovers that he did not receive what was promised. Recovery is in the nature of damages for breach of warranty. See *Rice* v. *Price*, 340 Mass. 502, 507, 510 (1960); Restatement (Second) of Torts § 549 comment 1 (1977).

[10]Because our holding is dispositive of the misrepresentation claim, we need not address DEC's claims that the judge committed error by excluding the deposition testimony of Cheatham, and in his instruction on reasonable reliance.

[11]General Laws c. 93A, § 11, eighth par., states: "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth."

did *not* occur primarily and substantially in Massachusetts and, if DEC had broken off negotiations before the culmination of negotiations on October 3, 1991, DEC's conduct would not have been unfair and deceptive; from October 2, 1991, forward, after Roy received the letter from the dean of Kuwait University, Kuwait, and realized that the computers would be delivered out of the Washington area and out of the country, "the deceptive and unfair stringing along of [KDCC] by DEC really began[,] [a]nd that stringing along culminated in late October with DEC's pretextual application of its own internal business policies as a basis for refusing to go forward with the agreement reached on October 3, 1991"; "[t]he business policies that formed the underpinning of DEC's breach were created, issued and imposed from DEC corporate headquarters in Massachusetts"; and Nealon, from his office in Massachusetts, "reemphasized the DEC policies which effectively slammed the door in the face of the deal."

The "primarily and substantially" test under c. 93A first appeared in § 3 (1) (*b*), inserted by St. 1967, c. 813, § 1, which stated:

> "(1) Nothing in this chapter shall apply to . . . (*b*) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, *excepting however transactions and actions which (i) occur primarily and substantially within the commonwealth,* and (ii) as to which the Federal Trade Commission or its designated representative has failed to assert in writing within fourteen days of notice to it and to said person by the attorney general its obligation to action proposed by him and set forth in said notice . . . ." (emphasis added).

Section 3 (1) (*b*) was struck by St. 1983, c. 242. The test was reintroduced by St. 1986, c. 363, § 4, which amended § 11 by rewriting the last paragraph. See note 11, *supra.*

We previously have considered the "primarily and substantially" test under the former § 3 (1) (*b*) in *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 582 (1982), and *Bushkin Assocs., Inc.* v. *Raytheon Co.*, 393 Mass. 622, 638 (1985). Those cases

provided a limited opportunity to address the scope of the test.[12] In both cases we declined to create a list of factors to be used in determining whether conduct alleged to be actionable under G. L. c. 93A, § 11, occurred primarily and substantially within the Commonwealth. See *id.* at 637 & n.11; *Burnham* v. *Mark IV Homes, Inc., supra* at 580 n.9.

We have misgivings about the utility of a formula for analyzing all cases under § 11. Whether the "actions and transactions [constituting the § 11 claim] occurred primarily and substantially within the commonwealth" is not a determination that can be reduced to any precise formula. Significant factors that can be identified for one case may be nonexistent in another.[13] Any determination necessarily will be fact intensive and unique to

---

[12]There is no legislative history that serves as an aid to the construction of "primarily and substantially." See *Bushkin Assocs., Inc.* v. *Raytheon Co.,* 393 Mass. 622, 637-638 n.11 (1985).

[13]The Appeals Court has taken a "functional approach" in which it considers whether "the preponderance of the wrongful conduct . . . and . . . the essential elements of the transaction . . . took place in Massachusetts." *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.,* 25 Mass. App. Ct. 302, 311 (1988). The Appeals Court has rejected a transactional analysis test that would "analyze all aspects of the parties' relationship to determine which State had the greatest contact with that relationship." *Goldstein Oil Co.* v. *C.K. Smith Co.,* 20 Mass. App. Ct. 243, 250 & n.8 (1985).

The United States Court of Appeals for the First Circuit has adopted a three-prong balancing test that looks to (1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct. See *Play Time, Inc.* v. *LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 33 (1st Cir. 1997); *Roche* v. *Royal Bank,* 109 F.3d 820, 829, 831 (1st Cir. 1997) ("the pragmatic, functional analysis is not necessarily limited to the three factors"); *Clinton Hosp. Ass'n* v. *Corson Group, Inc.,* 907 F.2d 1260, 1265-1266 (1st Cir. 1990).

The Appeals Court, like the Federal courts, places little weight on the "place of injury" factor, and rejects it as the determinative factor. See *Goldstein Oil Co.* v. *C.K. Smith Co., supra* at 249 n.7; *Clinton Hosp. Ass'n* v. *Corson Group, Inc., supra* at 1266. The situs of loss may, nevertheless, be considered in the determination. See *Bushkin Assocs., Inc.* v. *Raytheon Co., supra* at 638 ("Any loss was incurred in New York").

The Appeals Court has considered the "place of conduct" to be the determinative factor in at least one case, *Goldstein Oil Co.* v. *C.K. Smith Co., supra* at 250 & n.8, whereas the Federal courts generally consider the "place of conduct" factor to be "the least weighty" of the three factors. *Roche* v. *Royal Bank, supra* at 829.

each case. Cases in the nature of contract will be different from cases sounding in tort.

In addition, it may, or may not, be appropriate to decide cases involving wrongful conduct in multiple jurisdictions based on which jurisdiction was the source of the most instances of misconduct. On the one hand, a single instance of misconduct in one jurisdiction may have greater significance for a case as a whole than a multiplicity of instances of misconduct in another jurisdiction. On the other hand, the sheer number of instances of misconduct in one jurisdiction may produce the heft needed to resolve the question. The same observations may be made about the nature and number of instances of misconduct received, and misconduct acted on.[14] As Justice Kaplan noted, "The attempts, however, to single out particular factors that might control the functional inquiry and then to place these factors in some order of importance, are necessarily not fully satisfactory." *Sonesta Int'l Hotels Corp.* v. *Central Fla. Invs., Inc., supra* at 160.

We conclude that the analysis required under § 11 should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

We turn to the judge's analysis. We are satisfied that the

---

[14]The decisions of the Federal courts suggest that each factor is determined by the number of incidents of wrongful conduct committed and received in a jurisdiction, with no consideration given to the weight or significance of a particular incident in the context of the case. See, e.g., *Roche* v. *Royal Bank, supra* at 830 ("bulk" of wrongful acts; "slightly more" misrepresentations received in Canada); *Computer Sys. Eng'g, Inc.* v. *Qantel Corp.*, 571 F. Supp. 1365, 1372 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984) ("more of the relevant transactions and actions occurred within Massachusetts"); *Evans* v. *Yegen Assocs., Inc.*, 556 F. Supp. 1219, 1228 (D. Mass. 1982) (same). There is some suggestion that the Appeals Court, like the Federal courts, views incidents of wrongful conduct and the reception of wrongful conduct on a quantitative, rather than a case-impact, basis. See *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp., supra* at 310-311.

judge made an appropriate analysis based on facts that he found. However, some critical facts found by the judge are plainly erroneous. In particular, essential to his conclusion that DEC had failed to show that the wrongful conduct and transactions had not occurred "primarily and substantially" in Massachusetts was DEC's application of its internal business policies, which he found were "created, issued and imposed from DEC corporate headquarters in Massachusetts." However, the judge did *not* find that there was any impropriety in the creation or issuance of those policies, or that the policies themselves were unfair or deceptive. The policies were essentially neutral.

The judge further found that the policies were used to "unfair[ly] string along" KDCC. However, the judge found that Scully told Ayoub during the week of October 14, 1991, that corporate policy prevented the Washington office from handling a transaction that involved shipment of computers to a region that fell outside the jurisdiction of that office. There was no "stringing along" at that time, as Scully told Ayoub that the Washington office could not sell him the computer system. Under the facts found by the judge, Scully's prompt and straightforward application of a neutral corporate policy could not be unfair or deceptive conduct.

The same applies to Ayoub's conversation with Nealon. The judge found that Nealon told Ayoub that DEC policy prohibited the sale of computers by a district office in whose district delivery would not be made, and that the educational discount was not available to schools, colleges, and universities not located in the United States. Nealon had told Ayoub essentially what Ayoub had already heard from Scully, namely, that neutral corporate policy prohibited the sale by the Washington office. There was nothing unfair or deceptive about those policies, or the manner in which they were applied by Scully or Nealon. There was no evidence that Nealon could have responded sooner, or that the ten days it took him to get back to Ayoub caused KDCC any harm. Consequently, the fact that the policies were adopted and applied in Massachusetts, and the fact that Nealon was in Massachusetts, cannot be considered on the question whether the wrongful conduct occurred "primarily and substantially" in Massachusetts.

The judge's reliance on *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474 (1991) ("Conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes"), is misplaced. There were no known contractual arrangements that were disregarded or breached.

The matter of the adoption and application of corporate policies thus having been removed from consideration, virtually all the conduct that can be said to be unfair or deceptive, and the underlying negotiations, occurred in Washington. DEC was entitled to judgment on the c. 93A count because it met its burden of proving that the actions and transactions constituting the § 11 claim occurred primarily and substantially outside the Commonwealth.

5. *Conclusion.* The judgment on Count I (breach of contract) is affirmed. The order denying DEC's motion for judgment n.o.v. on Count II (misrepresentation) is vacated and we remand for entry of an order allowing DEC's motion for judgment n.o.v. The judgment on Count III (c. 93A) is reversed, and judgment is to enter for the defendant.

*So ordered.*