**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1672**

CURTIS A. EVANS; WHIPGOLF, LLC,

Plaintiffs - Appellants,

v.

PLUSONE SPORTS, LLC, a Massachusetts limited liability company; ALEX
VAN ALEN,

Defendants - Appellees.

**No. 16-1720**

CURTIS A. EVANS; WHIPGOLF, LLC,

Plaintiffs - Appellees,

v.

PLUSONE SPORTS, LLC, a Massachusetts limited liability company; ALEX
VAN ALEN,

Defendants - Appellants.

Appeals from the United States District Court for the Eastern District of Virginia, at
Alexandria. Claude M. Hilton, Senior District Judge. (1:15-cv-00683-CMH-TCB)

Argued: January 25, 2017                Decided: April 26, 2017

------

Before GREGORY, Chief Judge, and THACKER and HARRIS, Circuit Judges.

------

Affirmed by unpublished opinion. Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

------

**ARGUED:** Laurin Howard Mills, LECLAIR RYAN, PC, Alexandria, Virginia, for Appellants/Cross-Appellees. Bernard Joseph DiMuro, DIMUROGINSBERG, P.C., Alexandria, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Jonathan R. Mook, DIMUROGINSBERG, P.C., Alexandria, Virginia, for Appellees/Cross-Appellants.

------

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

The parties to this breach of contract dispute are in the business of selling sports equipment for the new sport of "fling golf" or "throw golf." In 2014, PlusOne Sports, LLC, and its owner, Alex Van Alen, learned that Curtis Evans was seeking a patent for a "throw golf stick" – the throwing apparatus that is the key piece of equipment in this modified version of golf. Van Alen reached out to Evans, and after negotiations, the parties signed a "Term Sheet" roughing out an agreement under which PlusOne would utilize Evans's patent in exchange for royalty payments. But although the Term Sheet provided that the parties would "work in good faith" toward a "binding" licensing agreement, negotiations broke down, and the contemplated final agreement was never executed.

When PlusOne, located in Massachusetts, refused to make the royalty payments outlined in the Term Sheet, Evans sued for breach of contract in federal district court in Virginia, home to Evans and his company, WhipGolf, LLC. The district court granted summary judgment to PlusOne, applying Virginia law and finding that the Term Sheet was not a binding contract. We now affirm that holding. Although the parties dispute whether Virginia or Massachusetts law applies, the Term Sheet is unenforceable under the law of either state as a provisional "agreement to agree." We also find that the district court properly granted summary judgment to Evans on PlusOne's counterclaims against him. Accordingly, we affirm the district court's judgment in all respects.

3

**I.**

**A.**

To play "throw golf" or "fling golf,"[1] participants use a "stick" similar to a lacrosse stick – rather than the standard set of golf clubs – to "fling" a golf ball around a standard golf course; once the ball has advanced to the green, players may use the end of the stick to putt the ball into the hole. Throw golf incorporates many of the rules of traditional golf. But unlike traditional golf, throw golf allows the inexperienced to play, given that little practice is needed to throw a golf ball down a fairway.

Both Evans and Van Alen were early entrants to the field, and each independently conceived of and developed their respective versions of throw golf and throwing sticks. Evans, for his part, began work in Virginia in 2011 on a prototype of his throwing apparatus, and in 2012 filed a provisional application with the United States Patent and Trademark Office ("USPTO"). A year later, Evans filed a patent application; published in May of 2014, it was that patent application that caught the attention of Van Alen and brought the parties together.

Meanwhile, Van Alen had himself been working in Massachusetts on a throwing device that he called the "FlingStick," used to play a game he termed "FlingGolf." After forming PlusOne in Massachusetts, Van Alen filed a provisional application for the FlingStick in 2013 and a patent application in 2014. PlusOne began selling the

---

[1] The parties have adopted different names for this new sport. To avoid confusion with the trademarked term "FLINGGOLF," we will refer to the sport as "throw golf."

FlingStick in July of 2014, and to avoid the possibility of a dispute over Evans's earlier patent application, it contacted Evans to discuss a licensing agreement.

Discussions began in August of 2014 and were in full swing by September and October. The parties communicated primarily by phone and email, but also met once in person over a game of throw golf in Virginia, using PlusOne's FlingStick. During these negotiations, PlusOne shared information with Evans regarding the FlingStick, including sample products, projected earnings, and a marketing plan. Unbeknownst to PlusOne, Evans was communicating simultaneously with a mechanical engineer, to whom he provided pictures of the FlingStick, along with product specifications, in an effort to develop a competing throwing apparatus.

On November 2, 2014, after exchanging several drafts, the parties executed the Term Sheet that is the basis for Evans's breach of contract claim. The four-page document lays out certain terms for a non-exclusive licensing agreement, under which PlusOne would utilize Evans's patent to sell the FlingStick, a "Licensed Product," in exchange for the payment of royalties. J.A. 285. Royalties are set at "7.5% of gross sales" for the years from November 1, 2014 to November 1, 2016 – an initial period during which PlusOne would be the only licensee – and range from 5% to 7%, depending on the number of sales, for "each year after Nov. 1, 2016." J.A. 284. The Term Sheet does not define "gross sales" or specify a time period for the contemplated license – that is, the number of "year[s] after Nov[ember] 1, 2016" during which PlusOne would be required to pay royalties to Evans. *Id.* But for each year during which the license was in

5

effect, PlusOne would be required to make a minimum royalty payment of $10,000 by January 5.

The Term Sheet also outlines other contemplated terms, including certain covenants and default provisions, restrictions on assignment rights, and clauses covering acceleration of payments, confidentiality, arbitration, and choice of law. Several of those provisions, however, are either rudimentary or altogether lacking in content. The arbitration clause, for example, appears to be a placeholder, stating only: "Arbitration clause, attorneys' fees and costs to party prevailing in event of breach." J.A. 287. Similarly, as to severability, the Term Sheet leaves space for a "standard severability provision." *Id.*

Critically, the Term Sheet closed with the following: "The undersigned parties agree to work in good faith to record the terms of this Term Sheet in a binding Non-Exclusive License Agreement." *Id.* And following execution of the Term Sheet, the parties indeed began to negotiate and draft a binding licensing agreement. Those negotiations stalled, however, when the parties could not agree on new terms not previously included in the Term Sheet. Evans prepared a twenty-page draft that added several new provisions and sought to fill in some of the Term Sheet's gaps, providing a definition of "gross sales," specifying a term (twenty years) for the license, and spelling out a detailed arbitration clause. PlusOne objected to many of these terms, including the twenty-year license period (which, it argued, could extend beyond the term of Evans's

6

patent) and the calculation of royalties without an offset for any licensing fees paid by PlusOne to other parties.

Negotiations further deteriorated when Evans revealed that immediately after executing the Term Sheet, he had filed a design patent application – seeking legal protection for a design that PlusOne believed to be a copy of its own product. Unable to bridge their differences, the parties reached an impasse in late November of 2014, and a final licensing agreement was never executed.

Nonetheless, on January 1, 2015, Evans emailed PlusOne, demanding the annual minimum royalty payment of $10,000 described in the Term Sheet. When PlusOne refused to make the payment and officially terminated any further negotiations, Evans declared PlusOne in breach of the Term Sheet and subsequently invoked the Term Sheet's acceleration clause, demanding that PlusOne pay $50,000 to cure the alleged default.

During this same period, Evans was keeping close watch on PlusOne's "FLINGGOLF" and "FLINGSTICK" trademark applications, filed in 2013. As part of the trademark registration process, an applicant must file a "statement of use" to verify that its trademark is being used in commerce. *See* 15 U.S.C. § 1051(d). But PlusOne failed to file the requisite statement, and when the USPTO notified PlusOne that it had two months to petition to revive its application for the marks, PlusOne overlooked that filing, as well. Evans, on the other hand, did not miss a thing, and contacted his attorney in January 2015 to inquire about "pick[ing] up" the marks that PlusOne seemed to have

abandoned. J.A. 1805. Just after PlusOne's deadline for petitioning to revive its application expired, Evans filed to register the "FLINGGOLF" and "FLINGSTICK" marks himself. In his application, Evans declared both that he had a "bona fide intention to use" those marks in commerce and that "no other person has the right" to do so. J.A. 1872. Just a few days later, PlusOne filed new trademark applications and subsequently initiated proceedings in the USPTO to oppose Evans's applications.

**B.**

Evans and his company, WhipGolf, filed suit against PlusOne and Van Alen for breach of the Term Sheet, seeking damages that included the minimum royalty payment. PlusOne counterclaimed, challenging Evans's applications for the "FLING" marks and his alleged "deceptive business practices" throughout the negotiations. J.A. 203.

The district court granted summary judgment to PlusOne on Evans's claim for breach of contract. *Evans v. PlusOne Sports, LLC*, No. 1:15-CV-683, 2016 WL 2901553 (E.D. Va. May 16, 2016) (unpublished). The court began by resolving the parties' dispute over choice of law, holding that Virginia rather than Massachusetts law should govern. Applying Virginia choice of law principles, *see Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004) (in diversity action, federal court applies choice of law rules of state in which it sits), the court determined that the parties' dispute turned on contract performance, not validity, so that the law of the place of performance should apply. That place was Virginia, the district court concluded, given

8

that licensing fee payments would have occurred in that state, as well as the delivery of sample products and certain business information to Evans.

The court then turned to the question at the heart of Evans's breach of contract claim: whether the Term Sheet constituted a binding and enforceable contract. Under Virginia law, the district court explained, "agreements to agree" are not binding contracts. And a document that refers to the parties' intent to draw up a future, more formal contract is treated as "strong evidence" that the parties "did not intend the previous negotiations to amount to an agreement which is binding." *Evans*, 2016 WL 2901553, at \*2 (quoting *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 580 (E.D. Va. 2013), *aff'd*, 549 F. App'x 211 (4th Cir. 2014)). That principle, the court found, applied squarely to the Term Sheet, which closed by providing that "[t]he undersigned parties agree to work in good faith to record the terms of the Term Sheet in a binding Non-Exclusive License Agreement," and thus indicated that the Term Sheet itself was not intended as a binding contract. *Evans*, 2016 WL 2901553, at \*2; J.A. 287. Moreover, the court reasoned, the Term Sheet failed to "incorporate all the material terms of a binding agreement," in light of the "informality, imprecision, and provisional nature" of its language. *Evans*, 2016 WL 2901553, at \*2. Accordingly, the district court concluded that the Term Sheet is an unenforceable "agreement to agree" that cannot give rise to a breach of contract claim. *Id.*

9

The court next considered PlusOne's counterclaims, granting summary judgment to Evans on all three.[2] First, PlusOne alleged slander of title arising from Evans's "FLING" trademark applications, claiming that Evans made false statements to the USPTO when he declared that he had a bona fide intent to use the marks and that nobody else had such a right. The court rejected that claim, emphasizing that PlusOne had produced no evidence that the complained of statements actually were false, and – given Evans's consultation with two attorneys before filing his applications – no evidence that they were made with malice, both essential elements of a slander of title claim.

Also in connection with Evans's trademark applications, PlusOne sought a declaratory judgment that it did not intentionally abandon its applications for the "FLING" marks. The district court explained, however, that under both the Lanham Act, *see* 15 U.S.C. § 1051(d), and USPTO rules, PlusOne's "subjective intent" in abandoning its applications "is not relevant." *Evans*, 2016 WL 2901553, at *3. Instead, PlusOne's "failure to make certain showings, or to request extensions . . . results in automatic abandonment regardless of intent." *Id.*

Finally, PlusOne alleged that Evans violated Massachusetts General Laws Chapter 93A by engaging in "unfair methods of competition and unfair and deceptive business practices," *see* Mass. Gen. Laws ch. 93A §§ 2 & 11 – specifically, by negotiating in bad

---

[2] In its counterclaim, PlusOne also raised four counts in direct opposition to Evans's breach of contract claim. The district court dismissed those counterclaims as moot after it determined that there was no enforceable contract and granted summary judgment to PlusOne on the breach of contract claim.

10

faith, "appropriat[ing]" the FlingStick design, and "maliciously" filing his applications for the "FLING" marks. J.A. 232–33. But a claim may be asserted under Chapter 93A, the court observed, only when the allegedly unfair conduct occurs "primarily and substantially" in Massachusetts. *Evans*, 2016 WL 2901553, at *3 (quoting Mass. Gen. Laws ch. 93A § 11). Given that the conduct in question was committed by Evans, who resided in Virginia and had contact with Massachusetts only via email and telephone, the court held that PlusOne could not prove a violation of Chapter 93A.

This timely appeal and cross-appeal followed.

## II.

### A.

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor. *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 409 (4th Cir. 2015). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.

We begin with Evans's breach of contract claim, on which the district court awarded summary judgment to Van Alen and PlusOne. Evans argues that the district court erred at the outset by applying Virginia law, which Evans contends is especially

hostile to preliminary agreements. Because the dispute in this case is fundamentally about contract validity, Evans asserts, Virginia choice of law principles point not to the place of performance but to the place of contract formation – here, to Massachusetts, where Van Alen placed the second and final signature on the Term Sheet and where, according to Evans, the law is more favorable to the enforcement of preliminary agreements.

We need not resolve this choice of law dispute. Under either Virginia law or Massachusetts law, the outcome is the same: The Term Sheet is not a binding contract. While there are differences between Virginia and Massachusetts law at the margins, this is not a marginal case. The Term Sheet's qualification that the parties would work toward a subsequent "binding" agreement, J.A. 287, combined with its open-ended and imprecise nature, render the Term Sheet unenforceable under both Virginia and Massachusetts law.

In Virginia, as the district court explained, it is "well settled" that "agreements to negotiate at some point in the future are unenforceable." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 300 (Va. 2016) (quoting *Cyberlock Consulting*, 939 F. Supp. 2d at 578); *see W.J. Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997). And – critically in this case – a document that refers to a "later, more formal agreement" and commits the parties to negotiate toward that later agreement is presumed to be an unenforceable "agreement to agree." *Virginia Power Energy Mktg., Inc. v. EQT Energy, LLC*, No. 3:11cv630, 2012 WL 2905110, at *4 (E.D. Va. July 16, 2012) (unpublished);

12

*see Navar*, 784 S.E.2d at 300. That is precisely what the final sentence of the Term Sheet does, and the district court properly construed the Term Sheet as an "agreement to agree" rather than a valid contract. Indeed, even Evans does not dispute that the Term Sheet is unenforceable under Virginia law.

Instead, Evans argues that the result would be different under Massachusetts law. But Massachusetts law has more in common with Virginia law than Evans suggests. Most fundamentally, the bottom line is the same: In Massachusetts as in Virginia, "[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." *Rosenfield v. U.S. Trust Co.*, 195 N.E. 323, 326 (Mass. 1935). And in distinguishing an unenforceable "agreement to agree" from a binding contract, Massachusetts law makes use of the exact same presumption as Virginia law, affording a "strong inference" against enforceability of a document that includes "language looking to execution of a final written agreement." *Goren v. Royal Invs. Inc.*, 516 N.E.2d 173, 175 (Mass. App. Ct. 1987). That "strong inference" is warranted here, *id.*, where the Term Sheet expressly contemplates that the parties will "work in good faith" toward a future agreement – underscoring the ongoing nature of negotiations – and that this future agreement will be "binding," in seeming contrast to the Term Sheet itself, J.A. 287.

It is true, as Evans argues, that under Massachusetts law, this inference may be overcome when the terms of a document are "sufficiently complete and definite" that the parties appear to have intended to be bound. *Duff v. McKay*, 52 N.E.3d 203, 208–09 (Mass. App. Ct. 2016) (enforceable agreement requires "terms sufficiently complete and

13

definite" and "a present intent of the parties . . . to be bound"); *see Goren*, 516 N.E.2d at 175 ("If [] the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract."). But here again, the district court's analysis under Virginia law carries over to Massachusetts law, as well. As the district court observed, the non-binding nature of the Term Sheet is evidenced not only by the parties' commitment to "work in good faith" toward a "binding" agreement, but also by the Term Sheet's failure to "incorporate all the material terms" of an enforceable contract. *Evans*, 2016 WL 2901553, at *2.

Evans disagrees with the district court's assessment, arguing that the primary "sticking points" in negotiations – the royalty rate and whether the FlingStick would be a licensed product – were addressed in the Term Sheet. Appellant Br. at 32–33 & 33 n.8. But the fact that some key points are resolved by a preliminary document does not mean that other issues are immaterial. And here, several of the terms left open in the Term Sheet are indeed material, going well beyond the "subsidiary matter[s]" that "may, on occasion" be left to future bargaining by a binding contract under Massachusetts law. *See Goren*, 516 N.E.2d at 176 (finding preliminary agreement binding where only "subsidiary matter[s]" remained unresolved).

First, the Term Sheet fails to resolve a number of issues regarding the royalty payments themselves, perhaps the most essential aspect of the contemplated agreement. The Term Sheet does identify royalties as a designated percentage of gross sales, as

14

Evans emphasizes. But it does not indicate how "gross sales" are to be calculated, and as PlusOne explains, that is not a matter free of doubt: "Gross sales" could be defined as the total of all sales without any deductions, or as the total amount received by PlusOne after deductions for discounts, returns, or rebates – and the choice could make a significant difference in the sum total of royalty payments. Moreover, the parties disagreed as to whether PlusOne would be entitled to an offset provision, allowing PlusOne to reduce its royalty payments to Evans if it were required to pay licensing fees to other parties; when PlusOne sought to add the offset to its post-Term Sheet draft agreement, Evans rejected the new provision. *Cf. Blomendale v. Imbrescia*, 516 N.E.2d 177, 179 (Mass. App. Ct. 1987) (concluding that because "[t]he buyer introduced new elements which had not been discussed, let alone agreed upon[,] . . . the parties did not intend to be bound by the preliminary document").

We doubt that the Term Sheet's imprecision regarding royalty payments could be resolved by recourse to "professional norms," as Massachusetts law sometimes permits, *Duff*, 52 N.E.3d at 209; indeed, PlusOne claims that the offset provision rejected by Evans is itself an "industry standard." J.A. 185. But even if it could, other open issues would remain. Nowhere, for instance, does the Term Sheet specify the duration of the proposed licensing agreement, so it is unclear for how long PlusOne would be required to make royalty payments to Evans. That this key term remained unresolved by the Term Sheet is reflected in the parties' subsequent negotiations, as Evans added a twenty-year term for the agreement and PlusOne rejected it because it could extend royalty payments

beyond the term of the patent. *See Rosenfield*, 195 N.E. at 326 (relying on later negotiations between the parties to show that "many material terms had not been settled"). Similarly, the Term Sheet "visibly reserve[s]" for the final agreement the contents of an arbitration provision, with a placeholder reading only "[a]rbitration clause, attorneys' fees and costs to party prevailing in event of breach." J.A. 287; *see Targus Grp. Int'l, Inc. v. Sherman*, 922 N.E.2d 841, 848 (Mass. App. Ct. 2010) (preliminary writings are incomplete and thus non-binding where "participants visibly reserved their commitment for the later documents"). An arbitration agreement can be essential to the resolution of future disputes, but the Term Sheet leaves open virtually every essential component of such an agreement, including under what circumstances arbitration may be invoked, the applicable rules, and how an arbitrator is to be selected.

In short, we agree with the district court that in light of the "informality, imprecision, and provisional nature" of the Term Sheet, that document "does not incorporate all the material terms of a binding agreement." *Evans*, 2016 WL 2901553, at *2. To put it in terms of Massachusetts law, the Term Sheet simply left open too much for it to be said that execution of a subsequent "binding Non-Exclusive License Agreement," J.A. 287, would be "hardly more than a formality," *Goren*, 516 N.E.2d at 176 (quoting *Coan v. Holbrook*, 97 N.E.2d 649, 651 (Mass. 1951)). Accordingly, under Massachusetts law as well as the Virginia law applied by the district court, the Term Sheet is an unenforceable "agreement to agree," and we affirm the district court's award of summary judgment to PlusOne and Van Alen on Evans's breach of contract claim.

16

## C.

We also affirm the district court's award of summary judgment to Evans on PlusOne's counterclaims, the first two of which relate to Evans's applications for registration of the "FLINGGOLF" and "FLINGSTICK" marks. In its slander of title claim, PlusOne focuses on two statements made by Evans in seeking registration: that Evans had a "bona fide intention" to use the marks, and that to "the best of [his] knowledge and belief, no other person has the right" to the marks. J.A. 1872. The district court held that as to both statements, PlusOne failed to establish slander of title as a matter of law, and we agree.

As the district court explained, to succeed on its slander of title claim, PlusOne must show not only that Evans's statements were false, but also that they were made "with malice or in reckless disregard of the truth." *Poindexter*, 792 F.3d at 411 (quoting *Wright v. Castles*, 349 S.E.2d 125, 129 (Va. 1986)). But PlusOne has introduced no evidence that Evans did not have a "bona fide intention" to use the "FLING" marks. On the contrary, as the district court found, the record shows the opposite; when he filed his declarations and soon thereafter, Evans was actively engaged in developing and marketing a game and product nearly identical to those for which PlusOne sought registration, and through WhipGolf, he had the capacity to make and distribute a product that would bear the "FLING" marks at issue. Nor is there any record evidence that Evans knew, at the time of his filing, that another person – PlusOne – had the right to the "FLING" marks and declared otherwise with the requisite malice, or "wanton or willful

17

disregard" of PlusOne's rights. *See Poindexter*, 792 F.3d at 411 (citation omitted). As the district court emphasized, Evans consulted with two attorneys about whether he could apply for the trademarks after PlusOne failed to file a timely statement of use. Evans was advised that he could proceed if PlusOne abandoned its applications, and that is exactly what he did, waiting until after PlusOne's two-month period to revive its applications had expired. Because PlusOne cannot establish that Evans knew of any falsity or displayed reckless disregard for the truth of his statements, the district court properly awarded summary judgment to Evans on PlusOne's counterclaim for slander of title.

In its next counterclaim, PlusOne seeks a declaratory judgment that it did not "intentionally abandon its applications" for registration of the "FLING" marks. J.A. 231. The district court granted summary judgment to Evans on the ground that PlusOne's subjective intent is irrelevant to the abandonment of a trademark application, and again, we agree. On this point, the Lanham Act is clear: "The failure to timely file a verified statement of use . . . or an extension request" by itself results in "abandonment of the application[.]" 15 U.S.C. § 1051(d)(4). Although an applicant who has missed a deadline may petition to revive its application if the delay was unintentional, that petition must be filed within two months of a notice of abandonment from the USPTO. *See* 37 C.F.R. § 2.66(a)(1). It is undisputed that PlusOne did not file a timely statement of use, *see* 37 C.F.R. § 2.88(a)(1); did not file an extension request, *see* 37 C.F.R. § 2.89; and did not petition to revive its applications by the two-month deadline of February 1, 2015, *see* 37 C.F.R. § 2.66(a)(1). As the district court explained, the result under the statutory and

18

regulatory scheme is "automatic abandonment [of the trademark applications] regardless of intent," rendering irrelevant PlusOne's allegation that it inadvertently failed to file the necessary documents.[3] *Evans*, 2016 WL 2901553, at *3.

Finally, PlusOne broadens its scope to allege that Evans's general pattern of dealings with it constituted unfair methods of competition and deceptive business practices in violation of Massachusetts General Laws Chapter 93A. As the district court explained, Chapter 93A requires that the allegedly unfair conduct occur "primarily and substantially" in Massachusetts. *Evans*, 2016 WL 2901553, at *3; *see* Mass. Gen. Laws ch. 93A § 11. Because that standard is not met here, we affirm the district court's grant of summary judgment to Evans on this last counterclaim, as well.

Under Chapter 93A, Massachusetts courts consider the facts in their totality in deciding whether "the center of gravity of the circumstances" giving rise to a claim is "primarily and substantially" in Massachusetts. *Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003). The burden is on the defendant – here, Evans – to show that the complained of actions did not occur primarily and substantially within Massachusetts. *See Auto Shine Car Wash Sys., Inc. v. Nice 'N Clean Car Wash, Inc.*, 792 N.E.2d 682, 685 n.7 (Mass. App. Ct. 2003) (citing Mass. Gen. Laws ch. 93A

---

[3] On appeal, PlusOne contends that its subjective intent is relevant to a different question: not whether it abandoned its trademark applications, but whether it abandoned the marks themselves, through discontinued use. We need not address that issue, because PlusOne's counterclaim is limited to a request for a declaratory judgment that PlusOne "did not intentionally abandon its *applications for registration*[.]" J.A. 231 (emphasis added).

§ 11). But "[w]hen 'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the Commonwealth, there can be no Chapter 93A liability." *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 236 (1st Cir. 2003) (quoting *Kuwaiti*, 781 N.E.2d at 800).

Like the district court, we think this is just such a case. The gravamen of PlusOne's allegation is that Evans deceived PlusOne throughout the parties' negotiations, making false statements and assurances that allowed Evans to misappropriate PlusOne's product designs, and then compounded the offense by demanding licensing fee payments to which he was not entitled and maliciously seeking to register the "FLING" marks as his own. The "center of gravity" of those actions is not in Massachusetts. The allegedly deceptive statements made to secure PlusOne's design and competitive information were made in Virginia, where Evans resided throughout negotiations. The allegedly wrongful use of that information – including the manufacture of a competing product; the demand for royalty payments; the attempt to register the "FLING" marks – all occurred in Virginia. And while PlusOne argues that it received the deceptive statements in Massachusetts and experienced its injury in that state, the place of loss is but one factor considered under the "center of gravity" test. *See Auto Shine*, 792 N.E.2d at 685. Here, it is not enough to shift the "center of gravity" of exclusively Virginia-based misconduct to Massachusetts for purposes of a Chapter 93A claim.

20

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*