Gants, Ralph D., J.
The plaintiff Julianne Bowler, the Massachusetts Commissioner of Insurance (“the Commissioner”), as Permanent Receiver of the Trust Insurance Company (“Trust”), has brought this Amended Complaint against the defendant Arthur Andersen, LLP (“Andersen”) alleging that the Commissioner reasonably relied to her detriment on Andersen’s audit opinion regarding the accuracy of Trust’s 1997 financial statements and, as a result, delayed until July 26, 2000 to petition the Supreme Judicial Court to declare Trust insolvent, resulting in greater losses than if she had earlier petitioned the Court to declare insolvency. Andersen has brought two motions for partial summary judgment, both intended to reduce the scope of damages that the Commissioner may recover at trial. The first motion contends that, as a matter of law, any reliance by the Commissioner on Andersen’s audit opinion was not reasonable after late September 1999, when the Department of Insurance (“DOI”) purportedly became aware that Andersen had withdrawn this audit opinion. The second motion contends that, as a matter of law, the Commissioner is not entitled to receive any damages from Andersen based on Trust’s “unpaid deficit obligations” to Commonwealth Automobiles Re-insurers (“CAR”). This Court will first provide the factual background for both motions, and then discuss each motion in turn.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the Commissioner and should not be misunderstood as findings of the Court.
Trust was a Massachusetts property and casualty insurance company that wrote primarily private passenger and commercial automobile insurance policies. DOI regulations require that every Massachusetts insurer “have an annual audit by an independent certified public accountant” and “file an annual audited financial report with the Commissioner on or before June 1 for the year ending December 31 immediately preceding.” 211 C.M.R. 23.05. After Trust’s prior auditor resigned in mid-1997, Trust retained Andersen to audit Trust’s 1997 statutory basis financial statements and to prepare the audit report to be submitted to DOI in accordance with 211 C.M.R. 23.05. Andersen conducted this audit and issued its audit report on May 29, 1998. The audit report was filed with DOI on June 1, 1998. In its audit report, Andersen gave an audit opinion certifying that its audit had been performed in accordance with Generally Accepting Auditing Standards (“GAAS”) and that Trust’s 1997 statutory basis financial statements “present fairly, in all material respects, the admitted assets, liabilities and surplus ofTrust Insurance Company as of December 31, 1997,” in conformity with statutory accounting practices prescribed by DOI. Trust’s 1997 financial statement disclosed that its surplus as of December 31, 1997 was $49,842,776. With Andersen’s audited financial report was a letter to Trust’s management from Andersen stating its understanding that the Commissioner would be relying on the financial statements and audit report in fulfilling her responsibilities to monitor and regulate Trust’s financial condition. The Commissioner and DOI did indeed rely on the Andersen audit report in making regulatory decisions regarding Trust.
Under G.L.c. 175, §4(2), DOI had a statutory obligation to conduct its own field examination of the books and records of every Massachusetts property and casualty insurer at least once every five years, and more frequently if the Commissioner “determines it to be prudent.” G.L.c. 175, §4(2). The purpose of such a field examination of an insurer is to “thoroughly inspect and examine its affairs and ascertain its financial condition, its ability to fulfil its obligations, whether it has complied with the law and any other facts relating to its business methods and management, and the equity of its dealings with its policyholders.” Id. Among the matters that the Commissioner must consider in “determining the nature, scope and frequency” of a field examination are “reports of independent certified public accountants.” G.L.c. 175, §4(3). No later than 60 days following completion of the field examination, the examiner in charge must file a written report with the Commissioner. G.L.c. 175, §4(10).
In March 1998, the Commissioner directed DOI to conduct a field examination to ascertain Trust’s financial condition as of December 31, 1997. This examination commenced one year earlier than the date prescribed by statute, in part because of the DOI examiners’ concerns regarding the accuracy of certain material balances reported by the Trust on its unaudited 1997 annual statement. The DOI’s field examina *87 tion staff went to Trust’s headquarters and commenced their field work on this examination in April 1998.
When DOI received Andersen’s audit report on June 1, 1998, DOI’s Director of Financial Analysis and Company Licensing, Robert Dynan, sent an email to then-Commissioner Linda Ruthardt stating his surprise that Trust’s financial statements for the year ending December 31, 1997 came in with “a clean opinion” from Andersen. DOI’s statutory examination of Trust proceeded after Andersen’s audit opinion was received, and an outside actuarial consultant was retained by DOI to review the adequacy of Trust’s loss reserves and loss expense liabilities reported in its 1997 financial statements. The DOI examiners did not complete their examination of Trust by the September 18, 1998 target completion date in part because the examiners were unable to verify, and had specific concerns about, the accuracy of balances reported by Trust on its 1997 financial statements. By the spring of 1999, DOI learned from its outside actuarial consultant that Trust’s reserves for the year ending December 31, 1997 were $10 million below the range the consultant determined to be reasonable. DOI, however, also understood that Trust had strengthened reserves in its 1998 annual statement.
Early in 1999, DOI learned that Trust’s management had admitted that its 1997 financial statements contained material errors. No later than February 1999, Andersen told DOI that Andersen now believed that Trust’s 1997 financial statements contained material errors and materially overstated Trust’s surplus as of December 31, 1997. Andersen also told DOI that Trust’s 1997 financial statements would have to be restated by Trust and then reaudited by Andersen. On February 25, 1999, DOI decided to broaden or “roll over” its statutory field examination of Trust’s financial condition to include Trust’s financial results for 1998 as well as 1997.
On April 28, 1999, Trust filed its unaudited 1998 Annual Statement with DOI, which reported a $27.9 million surplus. On June 16, 1999, Trust filed an amended, unaudited 1998 Annual Statement with DOI, which reported a $23.2 million surplus. Andersen orally told DOI that Andersen expected to issue a clean audit opinion for the 1998 financial statements, but Andersen never did issue any audit report or opinion concerning Trust’s 1998 financial statements. Nor did Andersen ever issue any audit report or opinion regarding Trust’s restated 1997 results.
On September 22, 1999, Andersen resigned its engagement with Trust. DOI learned of its resignation and decided to exercise its statutory authority under G.L.c. 175, §4(15) to conduct examinations under oath of various individuals concerning the financial condition of Trust. Brian Reilly and Edward Bader of Andersen both testified on October 13, 1999. Reilly testified that:
Andersen had informed Trust that its audited financial statements for 1997 “contained an error and required restatement”;
that the error concerned a “CAR reconciliation issue”;
that no “determination had been made” by Andersen as to whether, apart from this CAR reconciliation issue, Trust had materially misstated its December 31, 1997 financial statement; and
that Andersen had “not been able to make any determination conclusively” as to whether Trust had materially misstated its financial condition in the December 31, 1998 financial statement provided to the Commissioner.
No later than October 21,1999, perhaps on the date of its resignation on September 22, 1999, Andersen also withdrew its audit opinion regarding Trust’s financial statements for the year ending December 31, 1997. Andersen, however, did not communicate directly in writing with DOI about its withdrawal of the 1997 audit opinion.[1] The first written communication from Andersen on these matters received by DOI came, not from Andersen directly, but from Trust’s attorney, Robert Cordy[2] who wrote a letter to Dynan dated October 25, 1999 and received by DOI on November 1, 1999 enclosing a copy of a letter that Andersen had written to Trust “in response to Trust’s request that Arthur Andersen confirm that Trust’s letter of October 14, 1999 to the Division regarding Arthur Andersen’s departure as accountants was accurate." In Andersen’s enclosed response to Trust’s letter, dated October 21, 1999, Andersen wrote that, in connection with its audit of Trust for the year ending December 31, 1998, Andersen had informed Trust that it had withdrawn its opinions on the financial statements of Trust for the years ending December 31, 1997 and December 31, 1996. Andersen wrote that these opinions “were withdrawn due to the discovery of errors in the underlying financial statements.” Andersen also noted in this letter that it had identified other issues regarding its December 31, 1998 audit of Trust, but had made no determination prior to its resignation “as to the financial statement implication of these issues
Andersen’s enclosed response also made reference to a representation in an earlier letter that Trust had written to Andersen and offered its response to that representation:
Trust’s letter states that, pursuant to Massachusetts Regulations 211 CMR §23.07, in the 24 months preceding the termination of the audit relationship between Arthur Andersen and Trust there were no disagreements between Arthur Andersen and Trust on any matter of accounting principles or practice, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of *88 Arthur Andersen, would have caused Arthur Andersen to make reference to the subject matter of the disagreement in connection with its opinion. The letter proceeds to request Arthur Andersen to furnish a letter stating whether Arthur Andersen agrees with this statement.
Arthur Andersen agrees that Trust is accurate under the precise language of the regulation in saying there were no disagreements on the matters identified in the regulation. However, Arthur Andersen further states that this acknowledgment should not be interpreted to suggest that there was agreement between Arthur Andersen and Trust on the matters identified in the regulation.
Andersen letter to Trust, Oct. 21, 1999 at l.[3]
On November 4, 1999, DOI’s outside counselDavid Leslie of Rackemann, Sawyer & Brewstersent a letter to Trust’s counsel stating:
The Commissioner of Insurance has determined to place Trust under a confidential order of Administrative Supervision pursuant to G.L.c. 175J, §4 . . . The principal reasons for this decision are the following concerns:
1. Trust has not filed audited financial statements as required by G.L.c. 175, §25 for the period ending December 31, 1998, and the audit opinions on the financial statements for the periods ending December 31, 1997 and December 31, 1996 have been withdrawn.
2. Trust’s independent certified public accountants resigned in September 1998 [sic] . . .
On November 5, 1999, the Commissioner sent Trust a letter establishing the terms of DOFs administrative supervision of Trust. In that letter, the Commissioner told Trust that, “to abate the determination that Trust is subject to administrative supervision,” Trust must, among other things, engage a nationally recognized accounting firm as its designated independent certified public accountant and file with DOI “audited financial statements for the years ending December 31, 1996, December 31, 1997, and December 31, 1998 (and any other subsequent year for which financial statements are then due) with opinion letters from Trust’s designated certified public accountant.” Trust never did file any audited financial statements with DOI for 1998 or for its restated 1997 results.
On February 10, 2000, the Commissioner petitioned the Supreme Judicial Court to place Trust into temporary receivership for purposes of rehabilitation. The Supreme Judicial Court granted the petition that day. Between November 5, 1999, when DOI placed Trust under administrative supervision, and February 10, 2000, when Trust was placed under receivership, Trust continued to write and renew both automobile and homeowners’ policies. Trust no longer wrote or renewed any insurance policies after February 10, 2000. On May 25, 2000, the Supreme Judicial Court granted the Commissioner’s petition to cancel Trust’s automobile policies, effective October 1, 2000, and Trust’s homeowners’ policies, effective August 1, 2000. On July 26, 2000, the Supreme Judicial Court granted the Commissioner’s petition to declare Trust insolvent and to appoint the Commissioner the Permanent Receiver of Trust for purposes of liquidation. The Order became effective on August 2, 2000.
DISCUSSION
To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Phrased differently, summary judgment should be granted when, if the plaintiff were to prevail at trial on evidence identical to that in the summary judgment record, the court would be required to grant judgment notwithstanding the verdict, because, even when viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiffs favor based on that evidence. See generally Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992). In such cases, a trial would be a futile waste of judicial resources, because the ultimate result could not be altered by the jury’s verdict.
1. The First Motion for Partial Summary Judgment
In her amended complaint, the Commissioner alleges that Andersen negligently made misrepresentations in its Report accompanying Trust’s audited 1997 financial statements and in issuing its management letter. That Report provided the following unqualified audit opinion regarding Trust’s 1997 financial statements:
In our opinion, the financial statements referred to above present fairly, in all material respects, the admitted assets, liabilities, and surplus of Trust Insurance Company as of December 31, 1997, and the results of its operations and cash flows for the year then ended, in conformity with the basis of accounting described in Note A.[4]
*89 The letter to Trust management acknowledged that Andersen understood that Trust intended to file the audited financial statement with DOI and that the Commissioner will rely on that information in monitoring and regulating Trust. It also acknowledged that the purpose of its audit was to form an opinion and issue a report as to whether the financial statements present fairly, in all material respects, the assets, liabilities, surplus, and cash flows ofTrust. In its first motion for partial summary judgment, Andersen contends that, as a matter of law, any reliance by the Commissioner on Andersen’s audit opinion was not reasonable after late September 1999, when DOI purportedly became aware that Andersen had withdrawn this audit opinion.
In cases alleging negligent misrepresentation in supplying information for the guidance of others, as an accounting firm does in issuing an audit opinion, the Supreme Judicial Court has adopted the test taken from §552 of the Restatement (Second) ofTorts (1977), which provides:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniaiy loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 495-96 (1998), quoting Restatement (Second) ofTorts at §552 (1977). Under this test, the plaintiff must establish as an essential element of her claim of negligent misrepresentation that her reliance on the defendant’s false statement was “reasonable and justifiable under the circumstances.’’ Collins v. Huculak, 57 Mass.App.Ct. 387, 391 (2003). The question of whether reliance was reasonable and justifiable is generally one of fact left for trial, see id. at 392, but it may be resolved as a matter of law when no reasonable factfinder, viewing the evidence in the light most favorable to the plaintiff, could find that reliance was reasonable and justifiable. See Kuwaiti Danish Comp. Co. v. Digital Equipment Co., 438 Mass. 459, 467-70 (2003) (reversing trial court’s denial of motion for judgment notwithstanding the verdict on misrepresentation claim because the evidence was insufficient as a matter of law to support a finding that the plaintiff reasonably relied on a misrepresentation attributable to the defendant).
In Kuwaiti Danish Comp. Co. v. Digital Equipment Co., the defendant Digital Equipment Company (“DEC”) presented the plaintiff with a price quotation for the purchase of computer systems that included an educational discount, but the quotation contained qualifying statements that it was “an invitation to offer only,” and that “(a]ny contract resulting from the quotation must be accepted at IDEC’s] Corporate offices by a duly authorized representative of [DEC].” Id. at 462. The plaintiffs representatives (Ayoub and Ismail) reviewed the quotation for parts and pricing, but did not take the time to read these qualifying statements, which were contained in two paragraphs appearing below the total price quote and above the DEC representative’s signature. Id. The DEC representative (Roy) did not discuss the qualifying language or tell Ayoub or Ismail that any further approval was required from anyone at DEC. Id. Ismail prepared a purchase order at the request of Roy, which expressly referred to the quotation, and Ismail signed it. The representatives then “expressed satisfaction with the deal, shook hands, and parted.” Id. Later, DEC’S corporate offices rejected the educational discount and insisted upon a higher price, which triggered the misrepresentation claim. Id. at 463.
The Supreme Judicial Court recognized that it had earlier adopted the rule of the Restatement of Torts §540 (1938), which states: “The recipient in abusiness transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation.” Id. at 467, citing Yorke v. Taylor, 332 Mass. 368, 374 (1955). The Court reasoned:
Restatement (Second) of Torts §541 states: “The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.” There is thus a distinction between a falsity that could only be uncovered byway of “investigation” and a falsity that was readily apparent or “obvious.” Comment a to Restatement (Second) of Torts §540, supra, states that, “if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in §541.”
Reliance on any statement or conduct of Roy made during the course of mutual congratulations at having reached a deal was unreasonable as a matter of law because it conflicted with the qualifying language of Roy’s quotation, which stated that it was only an invitation to offer, and that any contract required approval from someone with authority at DEC. A cursory review of this language in the quotation would have alerted Ayoub and Ismail that they could not rely on (or interpret) Roy’s statements as indicative of a final deal. The qualifying language was presented essentially contemporaneously with Roy’s statements. No “investigation” was required. All that was required of Ayoub and Ismail was that they read the document to ascertain the obvious . . . There was no evidence that Roy tried to conceal the qualifying language from Ayoub or Ismail, or that he lulled them into ignoring it . . . There was no evidence that Roy represented that *90 the deal would be approved by those with that authority. . .
Id. at 468.
In this case at bar, the Commissioner contends that she relied on Andersen’s unqualified audit opinion regarding Trust’s 1997 financial statements even after she learned that Andersen had withdrawn that opinion. In essence, the Commissioner contends that it was reasonable for her to continue to rely on Andersen’s representation that the 1997 financial statements were fair and accurate when Andersen itself expressly declared that it had withdrawn that representation because of the discovery of errors in these financial statements. In Kuwaiti Danish Comp. Co. v. Digital Equipment Co., the Supreme Judicial Court found that it was not reasonable as a matter of law for the plaintiff to have relied on DEC’S conduct to conclude that a final deal had been reached because of the qualifying statements in DEC’S price quotation. Here, Andersen did not simply make qualifying statements regarding its audit opinion; Andersen expressly withdrew its entire opinion. Once the Commissioner learned that Andersen had withdrawn its opinion and no longer stood by its former representation regarding Trust’s 1997 financial statements, there was no justifiable basis on which the Commissioner reasonably could continue to rely on that audit opinion. Indeed, in the arcane world of auditors, where the English language often falls victim to the auditor’s ceaseless efforts to qualify its assertions, the withdrawal of an audit opinion is probably the clearest declaration of all that the audit opinion is no longer worthy of reliance. Anyone who relies on an auditor’s withdrawn opinion does so at her peril.
In attempting to defeat summary judgment, the Commissioner points to Reilly’s testimony of October 13, 1999 and Andersen’s letter to Trust dated October 21, 1999, forwarded by Mr. Cordy to DOI, and asserts that the statements made there justified her continued reliance on Andersen’s earlier representations in the audit opinions despite the withdrawal of those opinions. There are two fatal flaws in this argument. First, in her amended complaint, the Commissioner does not allege that she relied on these statements to her detriment; she specifically alleges that she relied on Andersen’s audit opinion and its management letter. She cannot at this late date now revise her allegations to contend that she separately relied on these assertions.
Second, Andersen’s audit opinion is essentially a representation that, after conducting its independent examination, it concluded that Trust’s financial statements for 1997 were fair and accurate in all material respects. Andersen was not responsible for Trust’s financial statements; those were Trust’s responsibility. Andersen was responsible only for its opinion regarding the fairness and accuracy of those financial statements. Once it withdrew its opinion, there may indeed have been reasons for the Commissioner to have continued to rely to some degree on those financial statements, but she could not rely any more on Andersen’s opinion because Andersen no longer was stating an opinion. After Andersen withdrew its audit opinion, Trust’s 1997 financial statements stood alone, unsupported by Andersen’s “seal of approval.” These financial statements may or may not be worthy of belief, but they cannot reasonably be viewed as worthy of belief because Andersen stood behind them. Therefore, even if there is a dispute of fact as to whether the Commissioner reasonably continued to rely on Trust’s 1997 financial statements after Andersen withdrew its audit opinion, that does not mean that there is a dispute of fact as to whether the Commissioner reasonably continued to rely on Andersen’s audit opinion after it had withdrawn that opinion.
Consequently, this Court finds as a matter of law that the Commissioner could not have justifiably relied on Andersen’s audit opinion regarding Trust’s 1997 financial statements after Andersen’s withdrawal of that opinion was unequivocally communicated to the Commissioner, and she therefore is not entitled to reliance damages after that date.
Andersen contends that its withdrawal of the audit opinion was communicated to the Commissioner in September 1999, but this Court finds that there is a dispute of fact as to when the Commissioner first learned of the withdrawal of that opinion. To be sure, the Commissioner has stated that she understands that Andersen withdrew its audit opinion in September 1999, but she has never stated that she learned of the withdrawal of that opinion in September 1999. Nor is there any evidence in the summary judgment record that unequivocally confirms that anyone at DOI learned of Andersen’s withdrawal of the audit opinion before DOI received on November 1, 1999 the letter from Andersen to the Trust confirming the withdrawal of its various audit opinions. Therefore, this Court grants partial summary judgment to Andersen only to the extent that this Court finds as a matter of law that, as of at least November 1, 1999, the Commissioner could not have justifiably relied on Andersen’s audit opinion regarding Trust’s 1997 financial statements.
2. The Second Motion for Summary Judgment
Andersen’s second motion for summary judgment is also designed to limit the scope of potential damages. It seeks a judicial declaration that, as a matter of law, the Commissioner may not receive any damages from Andersen based on Trust’s “unpaid deficit obligations” to Commonwealth Automobiles Reinsurers (“CAR”). To understand this second motion, one must first understood what CAR is and how it works.
Background
Under Massachusetts law, every person who drives a motor vehicle is required to have at least a minimum amount of automobile insurance. G.L.c. 90, §34J. If a *91 licensed driver does not obtain such insurance, he is prohibited from driving and the vehicle’s registration will be revoked. G.L.c. 90, §§34H & 34J. There are, however, many drivers in Massachusetts, as in every state, who cannot find an insurance company willing to insure them.
Historically, throughout the various fifty states, three different approaches have been taken to provide automobile insurance to those drivers whom no automobile insurance company voluntarily wishes to insure:
1. An Assigned Risk Plan, in which drivers who cannot find an automobile insurance company willing to insure them are randomly distributed among the automobile insurance companies licensed to do business in the state, generally in accordance with each company’s share of the voluntaiy automobile insurance market. Under an Assigned Risk Plan, an insurance company is permitted to refuse to offer voluntary automobile insurance to a driver and may tell him so, but must accept that driver and service his policy if he is involuntarily assigned to that company by the Plan. Once involuntarily assigned to an insurance company, the company bears the entire risk of any net losses that may be incurred by insuring that driver.
2. A Reinsurance Plan, in which any insurance company licensed to do business in the state must, with narrow exceptions, accept every qualified driver who applies for automobile insurance but may “cede” those drivers whose risks it does not wish to insure to a reinsurance pool. The insurance company continues to service those drivers it has ceded, but any premiums paid and losses arising from these drivers are treated as having been transferred to the reinsurance pool. The net losses suffered by the reinsurance pool from all ceded drivers are shared among all the insurance companies licensed to do business in the state, generally in accordance with each company’s market share of non-ceded drivers.
3. A Joint Underwriting Plan, in which drivers who cannot find an automobile insurance company willing to insure them are accepted and serviced by a joint underwriting association created by all the insurers licensed to do business in the state, with the net losses suffered by the joint underwriting association shared by those insurers.
See Commerce Insurance Company v. Commissioner of Insurance, Suffolk Civ. No. 05-0032-H, Memorandum of Decision and Order on Plaintiffs Motion for Judgment on the Pleadings, June 20, 2005, slip op. at 2-3 (19 Mass. L. Rptr. 441).
On July 7, 1983, the Legislature enacted Chapter 241, entitled “An Act Further Regulating Motor Vehicle Insurance,” which created a hybrid between the Reinsurance Plan and a Joint Underwriting Plan. See slip op. at 9. The 1983 legislation, in replacing the old G.L.c. 175, §113H with a revised version, made a number of substantive changes to what had previously been a pure Reinsurance Plan:
1. While prior to the revisions every insurance carrier serviced drivers in the involuntary market, the plan contemplated by the 1983 legislation provided that only some (but at least twenty) of the insurance carriers would service drivers in the involuntary market. G.L.c. 175, §113H(C). This was a variation on the more traditional Joint Underwriting Plan, in which a joint underwriting association is created by statute to service the involuntary market.
2. Since not every insurance company serviced drivers in the involuntary market, the new legislation needed to address the possibility that a non-servicing carrier would choose not to insure an applicant. It did so by eliminating G.L.c. 175, §113E (1973), which had forbidden any insurance company from refusing to issue a motor vehicle policy to a qualified applicant (except one without a valid driver’s license or with unpaid premiums) and effectively replacing it with two provisions. The first required that the “plan” shall provide motor vehicle insurance to everyone (except those without a valid driver’s license or with unpaid premiums) who has been unable to obtain insurance in the voluntary market. G.L.c. 175, §113H(A) (1983). The second provided that “every licensed agent or broker shall be assigned to at least one service carrier,” who is required to “service such agent or broker under substantially the same contractual terms and conditions governing their normal agency relationship and may not endorse or declare that the policy is underwritten by the plan.” G.L.c. 175, §113H(C) (1983). As a result of these changes, a driver applying for insurance from a non-servicing carrier could be turned away but could then apply for insurance from a licensed agent or broker assigned to an insurance company servicing the involuntary market. For all practical purposes, for servicing carriers, this was essentially a “take all comers” rule, provided the comers came through the broker or agent assigned to it.
3. While only some of the motor vehicle insurance companies doing business in Massachusetts would service the involuntary market, the plan would provide, as before, “for the fair and equitable apportionment among such insurance companies of premiums, losses, or expenses, or any combination thereof.” G.L.c. 175, §113H(A). This language reflected that this hybrid was still essentially a Reinsurance Plan, which equitably allocated losses among all insurance companies (both servicing and non-servicing), rather than an Assigned Risk Plan, which equitably allocated applicants and their risks.
*92 Slip op. at 9-10.
As a result of the 1983 legislation, a new plan was created with a new reinsurance facility (CAR) that served as a loss-sharing mechanism. In other words, CAR was the new entity created to ensure that all premiums, expenses and losses on ceded business are to be shared by all the servicing carriers. Id. at 10. CAR is administered by a Governing Committee consisting of 13 individuals appointed by the Commissioner, seven of them from insurance companies and six from insurance brokers. CAR Plan of Operation, Art. I. CAR’s Plan of Operation declares:
The law requires that all insurance companies licensed to issue motor vehicle insurance in the Commonwealth must become members of CAR and shall abide by this Plan and CAR Rules of Operation. Member Companies shall be financially responsible for all losses and expenses incurred by CAR. The Governing Committee shall prepare, in accordance with Article X of this Plan, Rules providing for the fair and equitable distribution of those losses and expenses through the assessment of Member Companies.
Id. at Art. I. The Governing Committee adopted Rules of Operation for CAR (“CAR Rules”), which became effective upon the approval of the Commissioner. Id. at Art. X.
Before discussing how the CAR Rules equitably allocate losses and expenses among the Member Insurance Companies, it is necessary first to provide some background as how these losses arise. When an individual in Massachusetts wishes to obtain automobile insurance, he, either directly or through a broker, will likely apply for insurance from a servicing carriera Member Insurance Company. The Company must provide automobile insurance to that individual, regardless of the risk he poses, but it will then evaluate the risk posed by that individual and either accept that risk for itself or cede that risk to the CAR pool. If the Company accepts that risk, that individual is placed in the voluntary market, and the Company will keep all the premiums paid by that individual on that policy and bear all the risk of loss. If the Company cedes the risk, that individual is placed in the involuntary market, and all the premiums paid by that individual and all the losses arising from his policy belong to CAR, to be shared among all the CAR Member Companies. Since the ceded drivers are those who each Company has determined pose too high a risk for it to bear alone, the pool of ceded drivers generally results in a substantial net loss to CAR. This net loss, along with CAR’s administrative expenses, comprise the CAR deficit, which CAR allocates among its Member Companies according to a complex formula based roughly on market share. The Company, however, will service that individual’s policy, so it will receive the premiums and pay the losses as they arise. Each quarter, CAR will determine how much each Company has received in premiums for these ceded drivers and how much it has paid in losses, as well as its proportionate share of the CAR deficit, and debit or credit the Company’s account with CAR depending on whether the Company has suffered net losses on its ceded drivers that are greater or lesser than its allocated share of the CAR deficit for all ceded drivers in the Commonwealth. This is referred to as the quarterly settlement balance.
On a Company’s financial statement, each Company is obligated to use accepted actuarial methods to predict the amount of losses that it will ultimately have to pay on the policies it has issued during that fiscal year, described as “ultimate losses.” See generally In the Matter of the Liquidation of American Mutual Liability Ins. Co. (“AMLICOIF’), 434 Mass. 272, 289-90 (2001). Ultimate losses are divided into three categories: (1) paid losseslosses actually paid during that fiscal year, generally for claims that are quickly resolved; (2) case reservesloss estimates for claims that have been reported under the policy but not yet resolved or settled; and (3) Incurred But Not Reported losses, known as “IBNR”loss estimates for claims that have not yet been reported but which, from past experience, are actuarially likely to arise. See id.
Under CAR Rule 11, a Member Company who issues automobile policies during CAR’s fiscal year is responsible for its allocated share of the ultimate losses that CAR suffers from the ceded policies in that fiscal year. Those ultimate losses may not be paid in the same fiscal year; a claim reported in 1999 may not be settled until 2002, but the Member Company still must share in the ultimate loss when it is paid. For Companies who continue to remain CARmembers, the timing of the ultimate loss is of little consequence, because they will simply receive quarterly adjustments on their CAR account based on the losses actually paid, regardless of the year of the policy on which those losses were paid. However, the timing becomes important when a Company terminates its membership in CAR, whether voluntarily by surrendering its right to issue automobile insurance in Massachusetts or by insolvency. CAR Rule 3(E), governing insolvent Companies, provides in part:
If any Member is declared insolvent by a court of competent jurisdiction, its membership in CAR shall terminate as of the date it is declared insolvent, but it shall be liable to CAR for all obligations incurred under the Plan or these Rules prior to the date it is declared insolvent. CAR shall compute the amount of such obligations in accordance with these Rules and shall be entitled to offset any liabilities of the Member to CAR against any liabilities of CAR to the Member.
CAR Rule 3(E).
After Trust was declared insolvent, CAR made a proof of claim against Trust as a general creditor in the amount of $34.7 million for what it contends to be Trust’s allocated unpaid share of CAR’s deficit arising *93 from ceded policies issued prior to 2001. Of this amount, $30.6 million arises from the policy years 1998-2000, while the remaining $4.1 million arises from policy years before 1998.
The Commissioner’s Claim for Damages
The Commissioner has brought this claim against Andersen in her dual capacity as receiver of Trust and as the representative of Trust’s policyholders and creditors with respect to common claims. “The weight of authority makes it clear that a statutory receiver, such as the [receiver] here, may prosecute claims on behalf of creditors and policyholders of the insolvent [insurance] company in order to preserve its estate assets, but may not maintain a suit in such a representative capacity if it is strictly personal in nature, that is, if the cause of action belongs clearly to the individual creditor or policyholder.” In re Liquidation of American Mutual Liability Ins. Co. (“AMLICO I”), 417 Mass. 724, 731 (1994), quoting Matter of the Liquidation of Integrity Ins. Co., 240 N.J.Super. 480, 491, 573 A.2d 928 (App.Div.1990).
The Commissioner’s theory of damages in this case has been characterized as a “deepening insolvency” or “wrongful continuation of life” theory. The Commissioner succinctly described this theory in her memorandum of law opposing this motion for summary judgment:
As in other deepening insolvency cases, the Commissioner does not allege that Andersen is responsible for the financial problems that led to Trust’s insolvency, but claims that as result of her reliance on Trust’s 1997 financial statements and Andersen’s audit opinion, Trust was allowed to suffer additional losses and become more deeply insolvent. Her claim is that but for her reliance, she would have acted sooner to exercise her regulatory authority to prevent Trust from continuing to write the new and renewal policies that resulted in additional losses. Thus, the damages sought by the Receiver represent the losses incurred by Trust as a result of the policies it issued after June 1, 1998, the date Andersen’s audit opinion was filed and the date the Commissioner began acting in reliance upon it.
Plaintiffs Memorandum of Law at 6. In short, the Commissioner contends that she would have taken appropriate regulatory action against Trust on June 1, 1998 but for Andersen’s negligent audit opinion and Trust would not have suffered the additional losses it incurred between June 1, 1998 and July 26, 2000 (when the Court declared Trust insolvent) as a result of the new and renewed policies it continued to write after June 1, 1998.[5]
There are two separate, albeit related, reasons why the claim made by CAR against the Receiver for deficit participation may not be included as an element of damages in this action against Andersen. First, it is undisputed that Andersen did not cause any injury to CAR or its remaining Members from its alleged negligent conduct. The portion of CAR Rule 3(E) that was not earlier quoted provides:
Any unsatisfied net liability of an insolvent Member shall be assumed by and apportioned among the remaining Members of CAR in the same manner in which underwriting results are apportioned by CAR. CAR shall have all rights allowed by law on behalf of the remaining Members against the estate or funds of such insolvent Member for sums due CAR.
CAR Rule 3(E). Under this Rule, if a Member becomes insolvent and cannot pay its net liability to CAR, the insolvent Member’s net liability is allocated among the remaining Members and paid by them, and CAR stands in the Members’ shoes to take legal action to recoup this net liability from the Receiver of the insolvent Member. For instance, if, hypothetically, there were ten automobile insurers in Massachusetts in 1999, all with equal allocated shares, and a CAR deficit of $50 million in 1999, each insurer would pay $5 million towards that deficit. If one of the ten insurers had been declared insolvent in 1998, the CAR deficit would still be $50 million in 1999, because the ceded drivers in the CAR pool that had been serviced by the insolvent insurer would simply have moved to one of the remaining nine Members, and these nine Members would now be required to pay $5.55 million towards that deficit. If that tenth insurer had delayed its insolvency until 1999 and been unable to pay its $5 million share of the 1999 CAR deficit, the other nine Members would still be required to pay $5.55 million towards that deficit, but CAR could make a claim to the Receiver for the unpaid $5 million and, if collected, each of the nine Members would be reimbursed for the $.55 million it assumed of the insolvent insurer’s unpaid net liabiliiy. The fact that CAR may file a claim with the Receiver for the insolvent insurer’s net liability does not mean, in this hypothetical, that CAR could reasonably claim that it or its nine Member insurers were injured by the fact that the insolvency was delayed until 1999. Regardless of whether the insolvency occurred in 1998 or 1999, its Members were still paying $5.55 million towards the CAR deficit.
Similarly, in the case at bar, neither CAR nor its remaining Members could reasonably contend that Andersen’s negligent audit opinion caused the CAR deficit to grow or its Members to pay a greater net liability than would have been incurred if Andersen had refused to issue its audit opinion on June 1, 1998. If Andersen had indeed acted reasonably and not issued a clean audit opinion on June 1, 1998 regarding Trust’s 1997 financial statements (as the Commissioner contends it should have), and if the Commissioner had that same day petitioned the Supreme Judicial Court to declare Trust insolvent, then Trust would have been declared insolvent on June 1, *94 1998 rather than July 26, 2000. It is undisputed, however, that an earlier declaration of insolvency would not have materially changed CAR’s operating deficit during this two-year period. That operating deficit derives from two sources: (1) CAR’s administrative expenses, which would not have materially increased because of Trust’s continued operation, and (2) the ultimate losses arising from the total pool of ceded drivers, which also would not have materially increased because the pool would be unchangedthe ceded drivers that had been serviced by Trust would simply have been serviced by another Member. Phrased differently, if, hypothetically, there were one million drivers in the ceded pool generating a CAR deficit of $50 million per year in 1999, there would continue to be one million drivers in the ceded pool generating a CAR deficit of $50 million per year in 1999 regardless of whether or not Trust had been declared insolvent. An earlier declaration of insolvency would simply have meant that the remaining Members would earlier have had to pay a greater share of the CAR deficit to make up for Trust’s absence from CAR. Indeed, CAR and its remaining Members were financially better off because Trust’s insolvency was delayed for two years, because during these two years Trust contributed more than $11 million towards CAR’s operating deficit, funds that CAR would almost certainly not have received if Trust had been declared insolvent on June 1, 1998. Since CAR could not itself contend that its net operating deficit was greater or its remaining Members were otherwise injured as a result of Andersen’s alleged negligence, the Commissioner cannot reasonably contend that her deepening insolvency theory of damages allows her to collect damages against Andersen on behalf of this creditor. Phrased differently, the Receiver cannot include a creditor’s claim as an element of damages against a defendant when the creditor itself would have no such claim against that defendant because the creditor was not harmed by (and instead benefitted from) the defendant’s conduct.
Second, the Commissioner’s inclusion of Trust’s share of CAR’s net deficit is inconsistent with its deepening insolvency theory. The Supreme Judicial Court in AMLICO I described a similar claim brought by the Commissioner against another insolvent insurer’s auditor as “based on the assertion that [the auditor’s] allegedly negligent auditing practices, and the reports sent to the Division of Insurance, permitted American Mutual to remain in business despite a lack of adequate loss reserves, thereby causing losses to policyholders, and perhaps others.” AMLICO I, 417 Mass. at 734 n.7. See also Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340 (3d Cir. 2001) (analyzing deepening insolvency theory of damages). This theory makes sense with respect to Trust’s participation in the voluntary insurance market because an insurance company without adequate loss reserves may generate additional losses when it is issuing and renewing insurance policies after it properly should have been declared insolvent. If an insolvent insurer continues to issue policies, then the Massachusetts Insurers Insolvency Fund, G.L.c. 175D, will need to pay even more claims when the insurer is ultimately declared insolvent, and the Fund can justly claim, as a creditor of Trust, that it was injured by Andersen’s negligence. See G.L.c. 175D, §8 (Fund retains right to recover from receiver amount it paid on claims of policyholders of insolvent insurer).
The deepening insolvency theory, however, does not make sense with respect to Trust’s participation in the involuntary insurance market because Trust’s share of CAR’s deficit in fiscal years 1998-2000 had nothing to do with its solvency but was based solely on its allocated share of the market as determined from the formula in CAR Rule 11. If, for instance, Trust had a ten percent share and CAR’s overall deficit for one of those fiscal years was $50 million, Trust would be assessed a deficit participation share of $5 million and this amount would be the same regardless of its fiscal health. It may be true that, but for Andersen’s negligence, Trust would have been declared insolvent two years earlier and CAR would not be demanding that Trust’s Receiver pay its share of the CAR deficit for those two years, but Andersen cannot be said to have proximately caused this loss because Trust’s share of the CAR deficit had nothing to do with Trust’s insolvency. CAR’s deficit participation claim for these two years does not derive from Trust continuing to operate while it was insolvent. Rather, CAR’s deficit participation claim for these two years derives simply from Trust having issued policies during these two years. Indeed, CAR’s deficit participation claims for these two years would have been the same if Trust had been solvent during those two additional years of operation.
This Court has carefully considered, and ultimately rejected, Andersen’s three other grounds for summary judgment. First, Andersen has argued that Trust’s share of CAR’s deficit participation for the ultimate losses arising from the policies issued in 1998-2000 is too speculative, because some of these losses have yet to be resolved and paid. This Court is persuaded by the Commissioner that the vast majority of these ultimate losses have already been paid, and that the small percentage still outstanding could reasonably be estimated through expert actuarial testimony.
Second, Andersen contends that the Commissioner cannot include the CAR claim as damages because there is no reasonable likelihood that this claim could ever be paid. Andersen argues that the Receiver will not come close to obtaining enough money through this litigation and her other collection efforts to pay the priority creditors in full, and CAR, as a general creditor, cannot obtain a penny until all the priority claims are satisfied. Even if it were true, which the Commissioner denies, that CAR realistically would never collect any money on its claim, this Court does *95 not find this to be a basis to bar a damage claim brought on behalf of a general creditor. Indeed, this Court risks a self-fulfilling prophecy if it were to bar a receiver from presenting a claim on behalf of a general creditor because the assets likely to be raised by the receiver will be too small to satisfy all the priority claims.
Third, although this Court finds it a close question, it does not accept Andersen’s contention that CAR is not entitled to any additional “unsatisfied net liability” from the Receiver. Andersen presents a two-pronged argument in support of this contention. Its first prong rests on its interpretation of CAR Rule 3(E), which provides, that when a Member is declared insolvent, it remains liable to CAR only “for all obligations incurred under the Plan or these Rules prior to the date it is declared insolvent.” CAR Rule 3(E). Andersen argues that an obligation is “incurred” under the Plan and the CAR Rules only when the losses are actually paid and CAR suffers an actual deficit, not when the policy on which those losses were paid was issued. The Commissioner and CAR contend that an insurer’s obligation to pay its share of the CAR deficit arising from ultimate losses are “incurred” under the CAR Rules when the policy is issued.
Andersen relies heavily on the difference in language between CAR Rule 3(D), which governs the liability of Companies that have voluntarily terminated their CAR membership, and CAR Rule 3(E), which governs the liability of insolvent companies. If a Member voluntarily terminates its CAR membership because it no longer issues automobile insurance policies in Massachusetts, it remains liable to CAR not only for “liabilities of the Member incurred prior to the termination of membership” but also for its “obligation to make payments pursuant to the provisions of CAR Rule 11ASSESS-MENTS AND PARTICIPATION, and the Member shall be charged or credited in due course with its proper share of all premiums, losses and expenses allocable to it under the Rides of Operation.” CAR Rule 3(D). In contrast, if a Member is declared insolvent, “its membership in CAR shall terminate as of the date it is declared insolvent, but it shall be liable to CAR for all obligations incurred under the Plan or these Rules prior to the date it is declared insolvent.” CAR Rule 3(E). Andersen argues that the absence of the reference to CAR Rule 11 in Rule 3(E) reflects that CAR intended an insolvent insurer to be liable only for its share of CAR’s actual operating deficit prior to the date of insolvency, and did not intend that insolvent companies continue to be responsible for any CAR deficit arising from CAR’s payment of ultimate losses derived from the policies the insurer issued prior to its declaration of insolvency. This Court credits ihe Commissioner’s and CAR’s interpretation of their own Rules, and accepts their formulation that Rule 3(E) leaves an insolvent insurer liable for its obligation to pay its allocated share of CAR’s deficit arising from CAR’s eventual payment of ultimate losses arising from policies issued prior to the date of insolvency. In the voluntary market, there is no question that an insurer incurs an obligation to pay ultimate losses on the date it executes the policy, even if the ultimate losses become due years later. In the involuntary market, under the CAR Plan, where the insurer does not pay the ultimate losses on the ceded policies it services but simply shares in paying the CAR deficit that arises from CAR’s payment of these ultimate losses, it is reasonable to interpret CAR’s Plan and Rules as providing that the obligation to share in paying the CAR deficit is also incurred on the date an insurer executes a ceded policy.[6]
The alternative prong of Andersen’s argument rests on the release in an Agreement between the Commissioner, as Trust’s Receiver, and CAR that was executed on March 27, 2001. That Agreement observes in its “Whereas” clauses that CAR had declined to settle the accounts of Trust for the quarter ending June 30, 2000 without an agreement, and that the parties wished to settle their differences and establish a final agreement on the financial obligations of Trust and CAR to one another. Under this Agreement, CAR agreed to pay the Receiver $695,292, plus interest from December 31, 2000, contingent upon approval by the court. This Agreement essentially resolved what CAR Rule 11(C) refers to as the “Settlement of Balances,” in which CAR issues quarterly summaries to each Member reflecting its cumulative balance and may reimburse the Member in the fourth quarter of the calendar year for any allowable credits in excess of written premiums. The Agreement provided a mutual release of claims. The Release granted to the Receiver and the Trust released them “from all past, present and future claims . . . arising out of or related to the membership of Trust in CAR or arising out of Trust’s status as a Servicing Carrier for CAR, provided, however, .. . that this release shall not extend to any claim by CAR relating to Trust’s obligations for deficit participation arising on and after the quarter ending June 30,2000 (as to which the paities agree CAR has the right to claim as a general creditor).” Andersen argues that, if the Commissioner is correct that Trust “incurred” an obligation under the Plan to share in the payment of the CAR deficit at the time it issued insurance policies, then Trust’s obligations have been released by the Agreement because the release covers “any claim by CAR relating to Trust’s obligations for deficit participation arising” before June 30, 2000. In other words, Andersen contends that, if the obligation for future deficit participation was “incurred” when the policy was issued, then the obligation has been released (except for the period between July 1-26, 2000) because it would constitute a “claim by CAR relating to Trust’s obligations for deficit participation arising” before June 30, 2000.
This is certainly a clever argument but it also clearly is not what any of the parties to the Agreement intended, because it would mean that CAR compromised a $34.7 million claim without either CAR or the Receiver recognizing it. This Court does not find that the Agreement *96 requires Andersen’s interpretation. An insurer’s general obligation to share in future deficit participation arising from ultimate losses may indeed be incurred in the year the policy was issued, but the insurer is not obligated to contribute a specific amount of money to pay off that deficit until the ultimate losses are actually paid and the deficit actually determined. The release in this Agreement essentially means that CAR cannot claim that Trust owes it any money for any Settlement of Balances regarding the CAR deficit for any quarter on or before the quarter ending June 30, 2000, but CAR reserves the right to claim that Trust owes money for Settlement of Balances in future quarters as part of Trust’s continuing obligation for deficit participation. Consequently, this Court does not find that CAR has released virtually its entire claim for deficit participation by the release in this Agreement.
Therefore, resting on the Court’s two related reasons and not the additional three arguments proffered by Andersen, this Court allows Andersen’s second motion for partial summary judgment to the extent that this Court finds that the claim made by CAR against the Receiver for deficit participation may not be included as an element of damages in this action against Andersen.
ORDER
For the reasons stated above, this Court ORDERS as follows with respect to defendant Andersen’s two motions for partial summary judgment:
1. As to Andersen’s first motion for partial summary judgment, this Court finds as a matter of law that the Commissioner could not have justifiably relied on Andersen’s audit opinion regarding Trust’s 1997 financial statements after Andersen’s withdrawal of that opinion was unequivocally communicated to the Commissioner, and the Commissioner therefore is not entitled to reliance damages after that date. In view of the undisputed facts in this summary judgment record, this Court ALLOWS Andersen’s first motion for partial summary judgment to the extent that this Court finds as a matter of law that, as of at least November 1, 1999, the Commissioner could not have justifiably relied on Andersen’s audit opinion regarding Trust’s 1997 financial statements.
2. As to Andersen’s second motion for partial summary judgment, this Court ALLOWS that motion to the extent that this Court finds that the claim made by CAR against the Receiver for deficit participation may not be included as an element of damages in this action against Andersen.

 The summary judgment record does not include any discussion of a withdrawal by Andersen of its 1997 audit opinion in the October 13, 1999 testimony of Reilly and Bader. If there was such a discussion, one would certainly have expected Andersen to include it, since it would be compelling evidence that DOI learned of the withdrawal no later than October 13, 1999.

 Of course, now-Justice Cordy at this time had not yet joined the Supreme Judicial Court.

 The Massachusetts regulation referenced in Andersen’s response provides in pertinent part as follows:
If an accountant who was the accountant for the immediately preceding filed audited financial report is dismissed or resigns the insurer shall within five business days notify the Division of this event. The insurer shall also furnish the Commissioner with a separate letter within ten business days of the above notification stating whether in the 24 months preceding such event there were any disagreements with the former accountant on any matter of accounting principles or practice, financial statement disclosure, or auditing scope or procedure; which disagreements, if not resolved to the satisfaction of the former accountant, would have caused him to make reference to the subject matter of the disagreement in connection with his opinion. The disagreements required to be reported in response to 211 CMR 23.07 include both those resolved to the former accountant’s satisfaction and those not resolved to the former accountant’s satisfaction. Disagreements contemplated by this section are those that occur at the decision making level, i.e., between personnel of the insurer responsible for presentation of its financial statements and personnel of the accounting firm responsible for rendering its report. The insurer shall also in writing request such former accountant to furnish a letter addressed to the insurer stating wither the accountant agrees with the statements contained in the insurer’s letter and, if not stating the reasons for which the accountant does not agree; and the insurer shall furnish such responsive letter from the former accountant to the Commissioner together with its own.
211 CMR 23.07.

 Note A declares that the financial statements were prepared on the basis of accounting principles prescribed or permitted by DOI, which differ in some respects from GAAS. The significant differences with GAAS were specified.

 As a result of this Court’s ruling on the first motion for summary judgment, the period of detrimental reliance has essentially been shortened to the 17-month period between June 1, 1998 and November 1, 1999.

 CAR’s Rule 30(b) (6) witness testified that CAR interpreted its Rule 11 to require that an insurer is obligated to share in an entire policy year’s deficit even if it issued only one policy during that year. This interpretation has been described as the “in for a day, in for the year” rule. Under this interpretation, Trust would be liable for its share of the CAR deficit arising from ultimate losses derived from all policies issued in 2000 even though it was declared insolvent on July 26, 2000 and did not issue any policies after that date. Both the Commissioner and Andersen agree that this interpretation is inconsistent with Rule 3(D), which limits an insolvent insurer’s liability to “all obligations incurred under the Plan or these Rules prior to the date it is declared insolvent.”
While generally this Court gives deference to CAR’s interpretation of its own Rules, this Court sides with the Commissioner and Andersen on this issue, because it believes that CAR is confusing the rules applicable to a Member who chooses no longer to insure automobiles in Massachusetts with those applicable to a Member who has become insolvent. When a member voluntarily surrenders its license to write Massachusetts automobile insurance policies, its membership in CAR is terminated at the close of CAR’s fiscal year, regardless of when the surrender takes place. CAR Rule 3(D). When a Member is declared insolvent, its membership in CAR is terminated on that date and it is not responsible for any obligations incurred to CAR after that date. CAR Rule 3(E). While the “in for a day, in for the year” rule may apply to insurers who voluntarily resign as Members, it would violate CAR Rule 3(E) to permit it to apply to insolvent insurers.